Jane Roe,

        Plaintiff,

      v.               Case No. 2:26-cv-504

United States of America,

        Defendant.

## COMPLAINT

## INTRODUCTION

1.     Plaintiff Jane Roe was sentenced by a judge to 111 months to be rehabilitated by the United States Bureau of Prisons ("BOP") on December 9, 2019 and, after serving a portion of her sentence in state prison, entered BOP custody in 2021. At sentencing in her criminal case, the Judge expressed hope that she would be able to take advantage of rehabilitative programs in prison, and included recommendations in the judgment to BOP to enroll Ms. Roe in BOP's drug treatment program, referred to as RDAP, and to place her in an institution close to her home so that she could continue to get support from her family.

2.     After serving part of her sentence at the minimum security camp at Federal Correctional Institution Pekin, in Pekin, Illinois ("FCI Pekin"), she was transferred in May 2023 to the BOP's Federal Transfer Center in Oklahoma City ("FTC Oklahoma City") while awaiting transfer to a different facility.

[4809857.16]

3.      Within weeks of her arrival at FTC Oklahoma City she was groomed, manipulated, sexually harassed, and ultimately sexually assaulted by Officer Dawone Banks while he was acting in the scope of his employment both as a correctional officer and as Plaintiff's supervisor for her BOP-administered work detail.

4.      Shortly after Plaintiff arrived at the facility, Officer Banks recruited Plaintiff to work with him as a laundry worker.  He told her laundry workers get extra privileges, including extra time out at night.  He told her that he likes to "take care of" his workers.  Once Plaintiff started working with him, he would talk to her and give her snacks, and asked her to send him pictures through a family member to his personal contact information, which she did.  After a couple of weeks, he called her into his office at night, groped her, had her touch his genitals, and digitally penetrated her, causing her serious physical and emotional harm.

5.      Following the abuse, Plaintiff was placed in the Special Housing Unit ("SHU"), where Officer Banks again harassed her, before she was ultimately transferred.  Plaintiff has since endured physical harm and serious emotional anguish, including feelings of intense shame, anxiety, and traumatic memories of the abuse.  The abuse has also brought back traumatic memories of abuse she experienced as a child and domestic abuse she suffered prior to her incarceration, including by her co-defendant.

6.      Officer Banks' actions and abuse were open and obvious to various agents, servants, and employees of BOP who knew of and disregarded Banks'

harassing and abusive interactions with Plaintiff and other incarcerated women, in violation of the Prison Rape Elimination Act ("PREA") and its regulations.

7. Plaintiff brings this suit against Defendant United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to Plaintiff by BOP personnel including Officer Banks, within the scope of his employment with the BOP. Plaintiff seeks redress for Defendant's unlawful conduct, which caused her to suffer serious injuries and catastrophic harm.

## JURISDICTION AND VENUE

8. Jurisdiction is proper in this Court under 28 U.S.C. § 1346(b)(1), which grants the district courts exclusive jurisdiction over actions brought under the Federal Tort Claims Act.

9. Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1402(b) because Plaintiff resides within the Eastern District of Wisconsin.

## THE PARTIES

10. Plaintiff Jane Roe was at all times relevant herein incarcerated in BOP facilities, including at the Federal Transfer Center Oklahoma City ("FTC Oklahoma City"). She currently resides at a Residential Reentry Center, known as a halfway house, located in the Eastern District of Wisconsin.

11. Defendant United States of America ("United States") is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiff's claims under the FTCA. The United States is

a sovereign entity that has waived immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

12. The BOP is a component of Defendant United States' Department of Justice ("DOJ"). The BOP operates and is in possession and control of FTC Oklahoma City, which is an administrative security federal transfer center that processes both males and females.

13. At all relevant times, while acting and failing to act as alleged herein, Defendant United States acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at FTC Oklahoma City and responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Officer Banks.

14. While acting and failing to act as alleged herein, Defendant had complete custody and total control of Plaintiff. Plaintiff was dependent upon Defendant for her safekeeping, protection, personal security, and necessities. *See* 18 U.S.C. § 4042(a).

15. In performing the acts and/or omissions contained herein, Defendant, and each of its employees, acting under color of federal law, acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff. Each of

them knew, or should have known, that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiff and to her constitutionally, statutorily, and common law protected rights. Despite this knowledge, Defendant failed to take steps to protect Plaintiff and to ensure her rights to safety from sexual assault.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

16. Plaintiff has properly complied with the requirements of 28 U.S.C. § 2675 by presenting Plaintiff's claim in writing against the United States of America (*i.e.,* Claim No. TRT-SCR-2025-06968) on May 23, 2025, within two years of the accrual of this action. A supplement to the claim was timely presented in writing to BOP on June 3, 2025. BOP denied Plaintiff's claim on October 1, 2025.

## FACTUAL ALLEGATIONS

17. Correctional officers and guards are statutorily precluded from engaging in sexual acts with incarcerated persons, pursuant to 18 U.S.C. 2243(b). Despite this clear prohibition, sexual assault, and harassment of female incarcerated people by BOP staff have been serious, systemic problems in BOP facilities for decades.

18. The United States Senate's Permanent Subcommittee on Investigations found that between 2012 and 2022, "BOP employees sexually abused female prisoners in at least two-thirds (19 of 29 facilities) of federal

prisons that have held women."[1]  The Committee further noted that women "are significantly more likely to be sexually harassed and abused while incarcerated," and that "women with histories of sexual abuse—including women in prisons and jails—are particularly traumatized by subsequent abuse."[2]

19.     In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct.[3]

20.     The working group noted long-standing, pervasive problems throughout the BOP. The working group also learned of long-standing insufficient reporting mechanisms, "flawed investigations," and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[4]

---

[1] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 1 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf (hereinafter "Senate Report")

[2] *Id.* at 6.

[3] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, Nov. 2, 2022, https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf.

[4] *Id.*

21.     The working group also noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[5]

22.     In October 2022, the DOJ Office of the Inspector General ("OIG") issued a report detailing its concerns over how the BOP had been handling administrative misconduct investigations and prisoner statements relevant to those investigations.[6]

23.     The OIG specifically noted that "[t]he BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates."[7]

24.     The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens

---

[5] *Id.*

[6] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[7] *Id.*

miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences."[8]

25. The report explained that the "OIG has serious concerns that that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees."[9]

26. In sum, "[t]he OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[10]

27. As the United States Senate's Permanent Subcommittee on Investigations put it, "BOP 'staff sexual relations with inmates is always illegal' as there is no 'consent' defense to a violation of 18 U.S.C. § 2243(b).'"[11] "This is

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 7 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf (hereinafter "Senate Report") (quoting Department of Justice, Office of Inspector General, Deterring Staff Sexual Abuse of Federal Inmates (Apr. 2005)

because the 'inherently unequal' relationship between BOP employees and prisoners precludes prisoners from having 'the same ability as staff members to consent to a sexual relationship.'"[12] *See also* 28 C.F.R. § 115.6 (defining "sexual abuse of an inmate . . . by a staff member" as including enumerated acts, "with or without consent of the" incarcerated person).[13]

28. FTC Oklahoma City's Holdover Admission and Orientation Handbook ("Handbook") includes an attachment dated March 2014, titled "Sexually Abusive Behavior Prevention and Intervention An Overview for Offenders," which provides that "sexual acts or contacts between an inmate and a staff member, even when no objections are raised by either party, are always forbidden and illegal."[14]

29. Per BOP policy, "[t]ermination shall be the presumptive disciplinary sanction for staff who have engaged in sexual abuse." BOP Program Statement 5333.01 at 55 (quoting 28 C.F.R. § 115.76(b)).

---

(https://oig.justice.gov/sites/default/files/archive/special/0504/index.htm).

[12] *Id.* (quoting Department of Justice, Office of Inspector General, Deterring Staff Sexual Abuse of Federal Inmates (Apr. 2005) (https://oig.justice.gov/sites/default/files/archive/special/0504/index.htm).

[13] *See also* BOP Program Statement 5333.01, Mar. 19, 2026, available at https://www.bop.gov/policy/progstat/5333_001-1.pdf (rescinding 5324.12, available at https://www.bop.gov/policy/progstat/5324_012_cn-1.pdf).

[14] Federal Transfer Center Holdover Admission and Orientation Handbook Revised August 2017, available at https://www.bop.gov/locations/institutions/okl/okl_holdover-ao-handbook.pdf.

30. Officer Banks, the BOP, and the United States owed a duty of care to Ms. Roe and those similarly situated of "safekeeping, care . . . [and] protection" under 18 U.S.C. § 4042(a)(2), (3) and violated this duty toward to Ms. Roe.

31. The Prison Rape Elimination Act ("PREA") of 2003 required the Attorney General to promulgate rules to prevent sexual abuse prison facilities. *See* 34 U.S.C. § 30307. In 2012, the U.S. Department of Justice issued regulations designed to "prevent, detect, and respond to prison rape." 28 C.F.R. § 115, 77 Fed. Reg. No. 119 (June 20, 2012). These regulations were immediately binding on BOP facilities. *Id*.

32. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; prevention, reporting, detection, and response to such behavior; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; signs and dynamics of sexual abuse in confinement, and "common reactions of … victims"; and "how to avoid inappropriate relationships with inmates." *Id*. § 115.31(a).

33. The regulations greatly restrict the circumstances whereby officers may view incarcerated people's naked bodies. Facilities are also required to "implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." *Id*. § 115.15(d)

34.     FTC Oklahoma City's handbook notes that "both male and female staff routinely work and visit inmate housing areas," which include showers and sleeping areas.  The Handbook, which Officer Banks and other BOP employees are familiar with, further states that "the Standards of Employee Conduct prohibit employees from engaging in, or allowing another person to engage in sexual, indecent, profane or abusive language or gestures, and inappropriate visual surveillance of inmates.  Influencing, promising or threatening an inmate's safety, custody, privacy, housing, privileges, work detail, or program status in exchange for sexual favors is also prohibited."[15]

35.     The PREA regulations also require that agencies ensure facilities "develop, document, and make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse."  *Id*. § 115.13(a). Pursuant to the regulations, facilities shall take into consideration a number of factors related to staffing and video monitoring, including any "findings of inadequacy" from federal investigative agencies and oversight bodies.  *Id*. § 115.13(a)(3)-(4). They shall also take into consideration any "blind-spots" in the facility or "areas where staff or inmates may be isolated."  *Id*. § 115.13(a)(5).

36.     The Unit Officer at FTC Oklahoma City has total control over hiring and firing of incarcerated people signed up for orderly positions, which includes

---

[15] *Id.*

laundry workers, and has authority to remove people from the job if they do not follow the officer's instructions.

37.     Plaintiff entered BOP custody in 2021 and was first incarcerated at the minimum security camp located at Federal Correctional Institute (FCI) Pekin in Illinois.

38.     While at the camp at Pekin, in approximately March 2023, Plaintiff received a disciplinary sanction which led to her being transferred out of Pekin. On the way to her next institution, Ms. Roe was sent to the federal transfer center, FTC Oklahoma City.  Plaintiff arrived at FTC Oklahoma City on or around May 24, 2023.

39.     At FTC Oklahoma City, Plaintiff was housed in a unit, also known as a pod, with many other women.  The pod had two tiers for housing and a large open area.  Near the entrance of the pod, the first door on the left, was an office known as an officer station.  The unit officer, also known as the pod officer, would work there, and sometimes the officer in charge of laundry would also work there. Next-door to the officer station was the laundry room.  Also just within the pod's entrance, the first door to the right, was a laundry closet.

40.     Plaintiff first met Officer Banks within days of her arrival, when he started coming into the female pod to recruit the women there to work with him in laundry.

41.     Initially, Plaintiff was not going to sign up, because being a laundry worker looked like a lot of work.  However, Officer Banks kept coming by the

unit and told the women that being a laundry worker would get them extra privileges. Work at FTC Oklahoma City was not mandatory, but Plaintiff wanted to work so that she could afford items on commissary, such as being able to purchase coffee.

42. Officer Banks worked as the laundry supervisor and also worked as the unit officer when the other unit officer was not on duty. Officer Banks was frequently the sole officer supervising the unit and was frequently moving in and out of the housing unit with laundry.

43. When persuading Ms. Roe to sign up to work for laundry, Officer Banks told her one-on-one that he "takes care of" his workers, they get to stay out later, and that they are afforded extra privileges. These interactions with Officer Banks, when he was persuading her to work for laundry, took place out in the open in the unit. Plaintiff decided to start working for the laundry department, on or about June 1, 2023.

44. Once she began working for the laundry department, it turned out Officer Banks was telling the truth, and he regularly brought snacks such as chips and Kool-aide for her and other incarcerated people working for laundry and offered them all some extra privileges. Specifically, as a laundry worker, Plaintiff and other workers were able to stay out 30 minutes later than other incarcerated people because she worked in laundry. Given the restrictive setting of prison, the freedom of an extra 30 minutes outside of her cell, where she could use a phone without waiting for other incarcerated people to finish, was a significant benefit

for Plaintiff.  Officer Banks offered Plaintiff additional privileges he did not offer his other laundry workers, including giving her cookies, his personal Carmex lip balm, and his personal comb which was better quality than the flimsy combs available in the facility.

45.     Officer Banks also started spending time talking to Plaintiff about his personal life when he worked in her unit.  Sometimes he shouted across the unit to get her attention.  Officer Banks' attention made Plaintiff feel like he cared about her, and she became emotionally attached to him.

46.     Within just a few days of Plaintiff beginning to work in the laundry department, Officer Banks escalated to sexually harassing and assaulting Ms. Roe.

47.     Officers frequently walked back and forth in front of the showers in the pod where Ms. Roe resided, but most would walk by quickly and farther away from view of the women.  On at least one occasion, in approximately early June, while he was doing his rounds on the unit where Ms. Roe lived, Officer Banks looked in on Ms. Roe while she was naked in the shower.  He stopped, lingered, and stared at her for almost a minute.  She had her back turned away from him initially and when she saw him looking, she watched him and then turned back away.  She did not say anything, and thought he did this because he liked her. Upon information and belief, Officer Banks would do this to other incarcerated women as well.

48.     Shortly after this incident, Officer Banks gave Ms. Roe his personal email address and phone number and asked her for pictures of herself.  He did it

while she was signing up to work for him and took the pen she was using from her to write his personal email and phone number on a corner of the paper, then ripped it off and gave it to her.

49. The email address Officer Banks wrote was bigblackdog580@gmail.com. Upon information and belief, that email address belongs to Officer Banks.

50. Plaintiff gave the email address by phone to a family member outside of prison who then, on multiple occasions, sent Officer Banks photos which the family member already had of Plaintiff. Officer Banks would come into work and confirm to Plaintiff that he received her photos. On at least one occasion, Officer Banks showed Ms. Roe his Apple Watch, which displayed a topless photo of her, which her family member had sent him. Officer Banks also communicated back with her family member, asking for more pictures.

51. These interactions with Officer Banks were all out in the open on the unit, where other incarcerated people could see and hear, and where the unit officer—when Officer Banks was on laundry duty only—could also see. There were also surveillance cameras in the unit.

52. On June 10, 2023, in an email time-stamped 2:04 p.m., with Plaintiff's name as the subject line, Plaintiff's family member sent Officer Banks four photographs of Plaintiff. In one of those photographs, Plaintiff is topless.

53. On or around the evening of June 10, when everyone else on the unit was either locked in their cells or using the phones, Officer Banks called Plaintiff

to the officer station. Plaintiff was out of her cell at that time because she was afforded that privilege as a laundry worker by Officer Banks.

54. When she arrived, Officer Banks told her to leave the door open a certain way so it would block the camera. The lights were off in the officer station. Officer Banks kissed her and turned her around, so she was leaning against a file cabinet. He then pulled her pants down and digitally penetrated her vagina. He removed his finger, licked his finger, and then digitally penetrated her anus. He then unzipped his pants and pulled out his penis, which he stroked and then had Plaintiff touch. Plaintiff was concerned that someone would see them and thought she heard someone, so she started backing away toward the door. She believes that Officer Banks intended to have sexual intercourse with her because he had begun pulling down his pants before she got nervous and started trying to leave.

55. As she left, Officer Banks told her to take some snacks, which were in a white Styrofoam tray, so she grabbed some cookies and a few other snacks on her way out.

56. On June 10, in an email time stamped 10:43 p.m., Officer Banks responded to the email from Plaintiff's family member sharing the four photographs, "[t]ell her I got it and my number is 2148658431[.]"

57. On June 11, in an email time-stamped 7:46 p.m., Plaintiff's family member responded to Officer Banks' June 10 email, saying "Sounds good!"

58. A day or two after assaulting Plaintiff in his office, Officer Banks

followed Plaintiff as she went into the laundry closet and groped Plaintiff's breast under her clothing, pinched her nipple, and licked his lips. Officer Banks left before she did, so that they would not be seen leaving together.

59. On June 12, in an email time-stamped 12:58 p.m., Plaintiff's family member sent Officer Banks four more pictures of Plaintiff.

60. Later that day, in an email time-stamped 7:11 p.m., the family member wrote in an email to Officer Banks that Plaintiff "said you jinxed her lol she's stuck in there for another week!"

61. On June 13, in an email time-stamped 4:59:43 -0500, Officer Banks responded, "Haha! She might be[.]"

62. Shortly after Officer Banks groped Plaintiff in the closet, on or around June 16, Ms. Roe was sent to the Special Housing Unit ("SHU").

63. Plaintiff was told she was sent to the SHU due to two disciplinary incidents at her prior facility, the camp at FCI Pekin, though those disciplinary incidents were ultimately dismissed.

64. Upon information and belief, Ms. Roe may have been sent to the SHU in retaliation because the next day another incarcerated woman came into the SHU, was placed in the room next to Ms. Roe, and later said she had also been abused by Officer Banks.

65. Soon after Ms. Roe was placed in SHU, Officer Banks came to see her. He told her, "they sent me down here to make sure you have everything you need." The SHU was on a different floor from the pod where she had previously

been housed and where Officer Banks worked. Officer Banks also said that he was there to make sure that the other "girls" were "straight." She was not sure what he meant as to the other "girls," but believed he was just there to check up on her. She told him that the clothes they gave her were too big, and that she needed shower shoes, and he got her smaller size pants and smaller shower shoes. When he gave her those items, he held her hand, which made her think he cared about her.

66. When Officer Banks came to see Plaintiff in the SHU, another male officer who worked in the SHU was with Officer Banks. Plaintiff saw that the other officer was standing near Officer Banks, but the other officer did not intervene or seem to be paying any attention to him holding her hand.

67. Approximately one or two days after Officer Banks came to see Plaintiff in the SHU, another woman, who was brought into the SHU shortly after Ms. Roe, said that Officer Banks had sexually assaulted her. Plaintiff could hear the women in the cell next to hers through the vents in their cells. The other woman said she was in the SHU on Protective Custody status and that the laundry supervisor had pulled her into a closet and raped her. Ms. Roe knew she was referring to Officer Banks because he was the only laundry supervisor. Ms. Roe did not say anything, and she did not want to believe what this woman was saying. Ms. Roe felt angry and hurt that Officer Banks might have been involved with another incarcerated person.

68. Much later, Plaintiff realized that when Officer Banks came to see

her in the SHU, he must have known that he was or soon would be under investigation for sexual abuse of incarcerated women. She believed this was the case because he was accompanied by another officer and only lingered briefly at her cell.

69. Officer Banks made Ms. Roe feel loyal to him because of the privileges he provided her with. She delayed reporting his abuse because she felt the need to protect him even though he had abused her and was afraid of retaliation.

70. Upon information and belief, the United States knew or should have known that Officer Banks was sexually inappropriate with incarcerated women and had been in the past, including based on reports from other women and actions by Officer Banks that were observable to others.

71. As a result of being placed in the SHU at FTC Oklahoma City, Plaintiff was no longer able to earn money as a laundry worker for the approximately three weeks she was in the SHU. During this time, she also lost access to commissary, opportunities for recreation, and regular contact with family and other loved ones outside of prison.

72. Upon information and belief, Plaintiff's SHU placement at FTC Oklahoma City both extended her time at that facility and meant that she lost days that she could have otherwise been earning as good conduct time toward shortening her sentence.

73. On or about July 6, 2023, Ms. Roe was transferred to SFF Hazelton

in Bruceton Mills, West Virginia.

74.     When Ms. Roe was on the plane to go to SFF Hazelton, another incarcerated person on the flight told her that she had observed Officer Banks "taking a favor in" to Ms. Roe in the pod at FTC Oklahoma City, and that after Ms. Roe went into the SHU, Officer Banks had "started messing with someone else." The woman told Ms. Roe that it had been reported that officials came into the pod and walked Officer Banks off the pod during the time Ms. Roe was in SHU.

75.     While Ms. Roe was at SFF Hazelton, the two disciplinary sanctions from Pekin that she was told required her SHU placement at FTC Oklahoma City were dismissed by BOP and expunged.

76.     When Ms. Roe heard the new allegation against Officer Banks and that he had been removed from the pod, she was worried about him. In approximately August 2023, while at SFF Hazelton, Ms. Roe attempted to contact Officer Banks. Using Corrlinks, a monitored BOP email service, she sent Officer Banks a message asking if he was okay, but did not receive a response.

77.     Plaintiff did not consider reporting Officer Banks' abuse while she was at SFF Hazelton because she feared that she would get in trouble if she told anyone about what happened.

78.     In November 2023, Plaintiff was transferred from SFF Hazelton back to FTC Oklahoma City, as part of the process of being transferred to FCI Waseca, in Waseca, Minnesota. Plaintiff was told she was being transferred

because she had been set to participate in SFF Hazelton's Residential Drug Abuse Treatment Program ("RDAP"), but the program had been shut down, whereas FCI Waseca's RDAP program was still active.

79. It was emotionally difficult for Ms. Roe to be back at FTC Oklahoma City, just months after her abuse took place there. She did not see Officer Banks, and other incarcerated people told her he was still under investigation, and she heard again that he had been removed from the unit. Because Officer Banks had manipulated her into believing they had a romantic connection, she felt conflicted and still did not consider reporting his abuse. She was also afraid of retaliation if she did so, including losing her promised RDAP program placement or being sent to the SHU like the woman she had seen in the SHU before who had reported Officer Banks.

80. Later in November 2023, Plaintiff was transferred to FCI Waseca. Though she was told the purpose of her transfer was for the RDAP program, she was never actually permitted to participate in RDAP at Waseca.

81. While at FCI Waseca, an officer named Officer Brant began flirting with her and giving her special attention that felt like sexual harassment and like he was testing to see how far he could go with her. Officer Brant did late-night rounds of the dorm she was housed in and she was often the only one left awake at that time, reading in her bunk. Officer Brant would shine his light at Plaintiff and tell her to come with him, but she refused. Other times, Officer Brant would repeatedly wave her over to talk to him, but Plaintiff refused. Out of self-

preservation, she felt emotionally numb at this point in her incarceration and believes that Officer Brant perceived her as vulnerable.

82. In January 2025, Ms. Roe was transferred from FCI Waseca to a lower security camp at FCI Greenville.

83. In January 2025, an agent Ms. Roe believes worked with BOP's Special Investigative Service ("SIS") came to speak to her about the officer at FCI Waseca. She told the investigators about Officer Brant's behavior.

84. Because Ms. Roe was uncomfortable speaking with men, the investigators had her speak with her counselor, Ms. Feaster, about additional allegations Ms. Roe had decided to make. Ms. Roe decided to tell Ms. Feaster and the investigators, as well as Dr. Davis, the psychiatrist at Greenville, about what happened to her at FTC Oklahoma City, but did not use Officer Banks' name. She had come to realize that Officer Banks' abuse of incarcerated women was widespread, and that she was not the only one he had abused. But she still felt scared that she and Officer Banks would both get in trouble if she gave his name.

85. In approximately February or March 2025, after consulting counsel, she decided to reveal Officer Banks' name to SIS at FCI Greenville. The investigators assured her that she would not be punished, and that they would look into her allegations.

86. She remained afraid that reporting Officer Banks' abuse would lead to punishment for her or would lead to her then-approaching release date being pushed back. She had heard of other incarcerated people reporting abuse and then

having their release dates pushed back by case managers because the officers supported each other. She was also concerned that she would be placed in administrative detention or protective custody after reporting abuse, like Officer Banks' other victim had been in FTC Oklahoma. She also was concerned she would be cut off from contact with loved ones and deprived of out-of-cell time, programming, commissary, and other items, all for reporting abuse.

87. Because she was at a facility without a SHU, she believed she would be transferred to a county jail to be placed in administrative detention. This transfer would be disruptive, and any time spent in the county jail would be days that she could not earn good time credits toward going home.

88. On October 7, 2025, Ms. Roe was interviewed by two agents from the Department of Justice ("DOJ") Office of Inspector General ("OIG") during an investigation of Officer Banks. Despite continuing concerns about facing retaliation, especially given her then-upcoming release date, Ms. Roe cooperated with OIG by providing a full report about Officer Banks' sexual abuse at FTC Oklahoma City. As part of this report, Ms. Roe also sent OIG the record of the photos her family member had sent Officer Banks. Ms. Roe was released from FCI Greenville and transferred to a Residential Reentry Center, or halfway house, in Milwaukee Wisconsin, on January 6, 2026.

89. As a result of Officer Banks' egregious abusive conduct, Ms. Roe has suffered and continues to suffer grievous personal injuries, including sexual assault and extreme emotional trauma; mental anguish and resulting physical

symptoms; fear for personal safety; anxiety; depression; humiliation; and loss of enjoyment of life.

90. Ms. Roe feels as though she is constantly reliving Officer Banks' abuse of her. Even when she is not consciously thinking back on her time at FTC Oklahoma City, his abuse of her replays in her head.

91. Because of Officer Banks' abuse of her, Ms. Roe is unable to trust most people, especially men. She has isolated herself from her family. She has not felt safe or comfortable maintaining romantic relationships.

92. Prior to her incarceration, Ms. Roe experienced domestic violence. Her medical records from BOP reflect that she reported a history "of repeated neck injuries through domestic abuse." At her sentencing hearing, the judge noted that Ms. Roe's co-defendant, with whom she had been romantically involved, had abused her. Upon information and belief, BOP was aware of this prior abuse when Ms. Roe entered custody.

93. Ms. Roe also experienced sexual abuse as a child, making her more vulnerable to revictimization as an adult, and which, upon information and belief, BOP was also aware of when Ms. Roe entered custody.

94. The abuse she experienced from Officer Banks has brought back a lot of difficult memories and shame. The abuse from Officer Banks has retraumatized her and she feels deep disappointment in herself for believing that Officer Banks cared about her, and for becoming a victim of this abuse while incarcerated.

95.     Ms. Roe's continuing mental anguish has also manifested as intense discomfort even speaking about the abuse she endured, for fear that her privacy and trust would be violated.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Assault Under Federal Tort Claims Act, Oklahoma Common Law)**

96.     Plaintiff Jane Roe incorporates by reference every allegation in the preceding paragraphs as if fully set forth herein.

97.     Plaintiff brings this claim against the United States under the FTCA based on wrongful acts and/or omissions by Officer Banks, while acting within the scope of his employment as a federal correctional officer for the Bureau of Prisons.

98.     The above-described acts and omissions of Officer Banks and other BOP personnel constitute the tort of assault under the laws of the State of Oklahoma.

99.     Plaintiff's injuries were caused, in whole or in part, by intentional torts, i.e., assault, perpetrated by Officer Banks.  Under 28 U.S.C. § 2680(h), Defendant United States is liable for intentional torts perpetrated by its agents who are law enforcement officers, including correctional officers like Officer Banks, which occurred within the scope of their employment or under color of federal law, as here.

100.     As an incarcerated person, it was impossible for Plaintiff to provide

consent, under 18 U.S.C. § 2243(b).

101. When Officer Banks took Plaintiff into his office and digitally penetrated her vagina and her anus, he knew or should have known Plaintiff did not—and could not—consent for a sexual encounter and that any such interaction would be sexual assault.

102. Officer Banks acted intending to cause harmful or offensive contact, i.e., sexual abuse of an incarcerated person, or an imminent apprehension of such contact. Because Officer Banks had also begun to pull down his pants when they were in the officer station, Plaintiff was put in imminent apprehension that he would attempt to have intercourse with her.

103. Later, when Officer Banks cornered Plaintiff in the laundry closet and grabbed her breast under her shirt, he also acted intending to cause a harmful or offensive contact, or an imminent apprehension of such contact.

104. Officer Banks acted within the scope of his employment. Officer Banks' assault of Plaintiff took place during his work hours at FTC Oklahoma City, in an office reserved for correctional officers, while he was carrying out his responsibilities—including supervising Plaintiff and other incarcerated people as workers in the laundry department. Alongside his security responsibilities, Officer Banks, acting within the scope of his employment, recruited Plaintiff to work in his department. The scope of his employment included supervising extra minutes of out-of-cell time, which he used to sexually abuse Plaintiff.

105. Officer Banks' digital penetration of Plaintiff's vagina and anus

constitutes the commission of a sexual act.  *See* 42 U.S.C. § 1997e(e).

**SECOND CLAIM FOR RELIEF**
**(Battery Under Federal Tort Claims Act, Oklahoma Common Law)**

106.    Plaintiff incorporates by reference every allegation in the preceding paragraphs as if fully set forth herein.

107.    Plaintiff brings this claim against the United States under the FTCA based on wrongful acts and/or omissions by Officer Banks, while acting within the scope of his employment as a federal correctional officer for the Bureau of Prisons.

108.    Plaintiff's injuries were caused, in whole or in part, by intentional torts, i.e., battery, perpetrated by Officer Banks.  Under 28 U.S.C. § 2680(h), Defendant United States is liable for intentional torts perpetrated by its agents who are law enforcement officers, including correctional officers like Officer Banks, which occurred within the scope of their employment or under color of federal law, as here.

109.    The above-described acts and omissions of Officer Banks and other BOP personnel constitute the tort of battery under the laws of the State of Oklahoma.

110.    When Officer Banks took Plaintiff into the officer station and digitally penetrated her vagina and her anus, he acted intending to cause harmful or offensive contact with her person, i.e., sexual abuse of an incarcerated person. When Officer Banks approached Plaintiff in the laundry closet and grabbed her

breast under her shirt, he also acted intending to cause a harmful or offensive contact, or an imminent apprehension of such contact.

111. Further, as an incarcerated person, it was impossible for Plaintiff to provide consent, under 18 U.S.C. § 2243(b).

112. Officer Banks' harmful contact with Plaintiff's person directly resulted from his actions.

113. As alleged above, Officer Banks was acting within the scope of his employment as a correctional officer.

114. Officer Banks' digital penetration of Plaintiff's vagina and anus constitutes the commission of a sexual act. *See* 42 U.S.C. § 1997e(e).

## THIRD CLAIM FOR RELIEF
### (Negligence Under Federal Tort Claims Act, Oklahoma Common Law)

115. Plaintiff incorporates by reference every allegation in the preceding paragraphs as if fully set forth herein.

116. Plaintiff brings this claim against the United States under the FTCA based on wrongful acts and/or omissions by Officer Banks, while acting within the scope of his employment as a federal correctional officer for the Bureau of Prisons.

117. The above-described acts and omissions of Officer Banks, other BOP personnel, and Defendant United States constitute the tort of negligence under the laws of the State of Oklahoma.

118. **Duty.** Defendant United States owed a custodial duty to protect

Plaintiff from personal injury. Pursuant to 18 U.S.C. § 4042, the United States owes a duty to incarcerated people in BOP to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2), (3). Defendant United States was also statutorily obligated under the Prison Rape Elimination Act and BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by Ms. Roe.

119. Furthermore, Oklahoma law imposes on prison officials the duty of reasonable care and diligence to protect those in their custody from known or reasonably perceivable dangers.

120. **Failure to perform duty.** Officer Banks, acting within the scope of his employment as an employee of Defendant United States, failed to perform his duty to protect Plaintiff from injury by sexually abusing her. Defendant United States failed to adequately provide for the safekeeping and protection of Plaintiff by placing her under the care of Officer Banks. The facility also failed to adequately staff and monitor the facility in areas where staff may be alone with incarcerated people.

121. Defendant United States of America had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff throughout the BOP, through the above-mentioned Congressional investigation and other

government investigations referenced therein.

122. Defendant United States of America also had knowledge that employees are aware of which areas of facilities are not captured by video surveillance, and that they use this knowledge to be alone with and abuse female prisoners and to escape detection.

123. Defendant United States of America's knowledge of prior sexual abuse at multiple BOP facilities placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Plaintiff.

124. Upon information and belief, the United States knew or should have known that Officer Banks was sexually inappropriate with incarcerated women and had been in the past including based on reports from other women and actions by Officer Banks that were observable to others.

125. **Causation.** Plaintiff suffered injuries proximately caused by Defendant's failure to exercise the duty of care. Officer Banks' sexual abuse of Plaintiff directly caused her injuries.

126. Plaintiff's injuries include physical harm directly caused by Officer Banks digitally penetrating her vagina and her anus and grabbing her breast. Officer Banks' digital penetration of Plaintiff's vagina and anus constitutes the commission of a sexual act. 42 U.S.C. § 1997e(e).

127. Plaintiff's injuries also include emotional anguish, including feelings of intense shame, and traumatic memories of the sexual abuse she experienced as a child. This emotional distress resulted directly from Officer Banks' treatment of

her, making her believe that they had a romantic connection, and sexually abusing her.

## FOURTH CLAIM FOR RELIEF
**(Intentional Infliction of Emotional Distress under Federal Tort Claims Act, Oklahoma Common Law)**

128. Plaintiff incorporates by reference every allegation in the preceding paragraphs as if fully set forth herein.

129. Plaintiff brings this claim against the United States under the FTCA based on wrongful acts and/or omissions by Officer Banks, while acting within the scope of his employment as a federal correctional officer for the Bureau of Prisons.

130. The acts and omissions of Officer Banks constituted extreme and outrageous conduct.

131. Defendant United States, individually or through its agents, servants, contractors, and/or employees, engaged in extreme and outrageous conduct by subjecting Plaintiff to sexual acts while she was incarcerated in their custody, including physical penetration. They abused their authority and power to violate Plaintiff in a manner that is shocking, atrocious, and intolerable beyond all bounds of decency.

132. Plaintiff in fact suffered severe emotional harm, so substantial that no reasonable person in a civilized society should be expected to endure it. Plaintiff's emotional harm was tied to and caused by Officer Banks' commission of a sexual act, as detailed above.

133. Plaintiff's injuries were caused, in whole or in part, by intentional torts, i.e., intentional infliction of emotional distress, perpetrated by Officer Banks. Under 28 U.S.C. § 2680(h), Defendant United States is liable for intentional torts perpetrated by its agents who are law enforcement officers, including correctional officers like Officer Banks, which occurred within the scope of their employment or under color of federal law, as here.

134. The above-described acts and omissions of Officer Banks and other BOP personnel constitute the tort of intentional infliction of emotional distress under the laws of the State of Oklahoma.

135. Officer Banks, acting within his scope of employment as an employee of Defendant United States, acted intentionally and recklessly when he sexually harassed and assaulted Plaintiff at his place of employment, despite the fact that she could not consent because she was an incarcerated person and he was an officer charged with her safekeeping.

136. Officer Banks' digital penetration of Plaintiff's vagina and anus constitutes the commission of a sexual act. *See* 42 U.S.C. § 1997e(e).

137. Officer Banks, acting within the scope of his employment as an employee of Defendant United States, engaged in outrageous, indecent, and intolerable behavior when he sexually harassed and assaulted Plaintiff at FTC Oklahoma City, his place of employment, despite the fact that she could not consent because she was an incarcerated person and he was an officer charged with her safekeeping. Because of the restrictions in custody, Officer Banks, and

others employed by Defendant United States, had control over many of Plaintiff's activities. Officer Banks used his position of trust and safekeeping to sexually abuse her.

138. Officer Banks' conduct, including the physical injury caused by the sexual act of penetration, caused Plaintiff's emotional distress. While acting within his scope of his employment as an employee of Defendant United States, Officer Banks engaged in conduct that directly harmed Plaintiff. Plaintiff now experiences intense anxiety and emotional distress because of Officer Banks' abuse. Because of the isolating experience of being incarcerated and the privileges and special attention Officer Banks offered her, Plaintiff grew attached to Officer Banks; she feels ashamed and humiliated for feeling this attachment to her abuser. Further, Officer Banks' abuse retraumatized Plaintiff, causing her to relive memories of sexual abuse she experienced as a child, alongside constantly reliving Officer Banks' abuse.

139. Plaintiff's emotional distress has been so severe that no reasonable person could be expected to bear it, and it continues today. Afterward, she feared retaliation and did not feel safe to report Officer Banks' abuse until roughly a year and a half had passed. Months later, during an interview with OIG agents, Plaintiff was visibly anxious and the agents had to assure her multiple times that she would not face retaliation for reporting the abuse. Only after these assurances, Plaintiff disclosed the full extent of the abuse.

140. Still, two and a half years after Officer Banks' abuse of her, Plaintiff

experiences anxiety and feelings of shame and humiliation as a result of the sexual abuse and emotional manipulation she endured while serving her sentence in the care of Defendant United States.

**FIFTH CLAIM FOR RELIEF**
**(Negligent Hiring and Supervision Under Federal Tort Claims Act,**
**Oklahoma Common Law)**

141.    Plaintiff incorporates by reference every allegation in the preceding paragraphs as if fully set forth herein.

142.    Defendant United States of America hired Officer Banks and allowed him to use his position of power within the facility to exert influence over incarcerated people such as Plaintiff.

143.    Defendant United States of America knew that potential abusers such as Officer Banks would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.  Officer Banks was the sole officer in charge of laundry for the pod where Plaintiff resided and was often the sole officer supervising the pod.

144.    Defendant United States of America failed to properly oversee and administer FTC Oklahoma City and failed to properly implement BOP and PREA policies that would have deterred sexual abuse, such as that suffered by Plaintiff.

145.    As detailed above, the sexual abuse suffered by Plaintiff constituted the commission of a sexual act. 42 U.S.C. § 1997e(e).

146.    Defendant United States of America had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff throughout

the BOP, through the above-mentioned Congressional investigation and other government investigations referenced therein.

147. Defendant United States of America also had knowledge that employees are aware of which areas of facilities are not captured by video surveillance, and that they use this knowledge to be alone with and abuse female prisoners and to escape detection.

148. Defendant United States of America's knowledge of prior sexual abuse at multiple BOP facilities placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Plaintiff.

149. Upon information and belief, the United States knew or should have known that Officer Banks was sexually inappropriate with incarcerated women and had been in the past, including based on reports from other women and actions by Officer Banks that were observable to others.

150. If Defendant United States of America had properly supervised employees, facility staff such as Officer Banks would not have been able to sexually abuse prisoners.

151. If Defendant United States of America had conducted thorough investigations of reported employees, Officer Banks would not have been able to continue sexually abusing prisoners, including Plaintiff.

152. On information and belief, Defendant United States of America was also negligent in allowing employees who it knew had previously committed sexual abuse to continue to safeguard and monitor a female population of

prisoners.

153. If Defendant United States of America had properly supervised and investigated employees such as Officer Banks, it would have learned of his propensity to commit sexual abuse.

154. Defendant United States of America's above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jane Roe respectfully requests that judgment be entered against Defendant and that this Court grant the following to the Plaintiff:

1. An award of compensatory and nominal damages to Plaintiff in an amount to be determined at trial;

2. An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

3. An award to Plaintiff of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

4.  For such other and further relief as this Court may deem just and proper.

DATED:  March 27, 2026

/s/ Kara J. Janssen

Kara J. Janssen
WIED Bar No. 274762
Luma Khabbaz
WIED Bar No. 351492
Emma Stodder
WIED Bar No. 362691
Attorneys for Plaintiff
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
kjanssen@rbgg.com
lkhabbaz@rbgg.com
estodder@rbgg.com

Christopher E. Avallone
WI State Bar ID No. 1095465
Hanna R. Kolberg
WI State Bar ID No. 1067382
VON BRIESEN & ROPER, S.C.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, Wisconsin 53202
Telephone: (414) 276-1122
Christopher.avallone@vonbriesen.com
Hanna.kolberg@vonbriesen.com