JANE ROE,

        Plaintiff,

    v.                                Case No. 26-CV-00504

UNITED STATES OF AMERICA,

        Defendant.

## BRIEF IN SUPPORT OF MOTION TO DISMISS

Plaintiff, an inmate currently residing in a halfway house in Milwaukee, alleges that she was sexually assaulted by a federal Bureau of Prisons ("BOP") employee in June 2023 while incarcerated at a BOP facility in Oklahoma City. She seeks money damages from the United States under the Federal Tort Claims Act ("FTCA") for assault, battery, intentional infliction of emotional distress, negligence, and negligent hiring and supervision, pursuant to Oklahoma common law.

Plaintiff's allegations are troubling, and BOP employees are strictly forbidden from having sexual contact with inmates. But before the United States can be sued for torts committed by its employees, claimants must first comply with the FTCA's mandatory administrative claims-processing rules. Plaintiff did not timely present an administrative claim covering all the allegations included in her complaint in this case. Even if she had, this Court may only exercise jurisdiction over them to the extent the BOP employee's conduct fell within the scope of his employment, as a matter of law. It did not. Nor indeed does Plaintiff plead facts establishing that BOP had prior knowledge that its employee may sexually assault Plaintiff. The Court should,

therefore, dismiss all of Plaintiff's claims under Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6).

## BACKGROUND

### I. Plaintiff's Factual Allegations

#### A. Conviction and confinement

In 2019, Plaintiff was sentenced to a 111-month term of imprisonment. ECF 1 at ¶ 1. In 2021, after serving some time in state prison, Plaintiff entered BOP custody at Federal Correctional Institution ("FCI") Pekin, in Pekin, Illinois. *Id.* at ¶¶ 2, 37. In May 2023, BOP moved Plaintiff to the Federal Transfer Center in Oklahoma City, Oklahoma ("FTC OKC"), pending transfer to a different facility. *Id.* at ¶¶ 2, 38.

#### B. Encounters with Dawone Banks

Plaintiff arrived at FTC OKC on or around May 23, 2023. *Id.* at ¶ 38. She encountered a BOP employee named Dawone Banks within days of her arrival. *Id.* at ¶ 39. Shortly after Plaintiff's arrival, Banks, who was working as the laundry supervisor at the time, began entering the female pod where Plaintiff was housed and trying to recruit inmates to work in the laundry. *Id.* at ¶ 40. He promised the inmates extra privileges, and while Plaintiff was initially uninterested, she eventually agreed (on approximately June 1, 2023) so that she could better afford commissary items like coffee. *Id.* at ¶¶ 41, 43.

Plaintiff claims that Banks followed through on his promises of extra privileges by providing snacks, longer time out of her cell, additional access to use of a telephone, lip balm, and a better comb. *Id.* at ¶ 44. Banks took steps to make Plaintiff feel like he cared about her, and she quickly "became emotionally attached to him." *Id.* at ¶ 45. However, according to Plaintiff, Banks did not stop there.

Plaintiff alleges that "[w]ithin days" after she began working in the laundry (on or about June 1, 2023), Banks "escalated to sexually harassing and assaulting" her. *Id.* at ¶ 46. Specifically, Plaintiff indicates that in "early June" Banks was passing by the female inmates' showers when he "stopped, lingered, and stared at [Plaintiff naked in the shower] for almost a minute." *Id*. at ¶ 47.

Banks also Banks gave Plaintiff his personal email address and phone number, which Plaintiff in turn provided to one of her family members so that they could send Banks nude photos of Plaintiff. *Id*. at ¶¶ 48, 50. Specifically, Plaintiff's family member sent Banks a topless photograph of Plaintiff on June 10, 2023. *Id.* at ¶ 52. Banks would talk to Plaintiff about these photos openly where other inmates could see and hear, and where the "unit officer … could see." *Id.* at ¶ 51. There were also surveillance cameras in the unit. *Id.*

The same day, June 10, Banks invited Plaintiff to his office in the evening when all the other inmates were in their cells. *Id.* at ¶ 54. According to Plaintiff, Banks angled the door to block the surveillance camera's view. *Id.* He then kissed her, leaned her against a file cabinet, and digitally penetrated her vagina and anus. *Id.* He also stroked his penis and made Plaintiff touch it. *Id.* Plaintiff believes Banks intended to have sexual intercourse with her when she got nervous and started to leave. *Id.* She "grabbed some cookies and a few other snacks on her way out." *Id.* at ¶ 55.

Soon after that incident, on around June 11 or 12, Banks followed Plaintiff into a closet, groped her breast, and pinched her nipple. *Id.* at ¶ 58.

A few days later, around June 16, Plaintiff was sent to the special housing unit ("SHU"), which she believes was retaliatory. *Id.* at ¶¶ 62, 64. That same day, Banks visited Plaintiff in SHU, held her hand, and talked to her in a way that made Plaintiff think he cared for her. *Id.* at ¶

3

65. But in short order, another female inmate arrived in SHU, claiming that Banks had assaulted her. One or two days after Banks visited, so on June 17 or 18, another inmate arrived and she confided to Plaintiff that she too had been sexually assaulted by Banks. *Id.* at ¶¶ 64, 67. Plaintiff says she "felt angry and hurt that Officer Banks might have been involved with another incarcerated person," but she "delayed reporting his abuse because she felt the need to protect him even though he had abused her and was afraid of retaliation." *Id.* at ¶¶ 67, 69.

Plaintiff had no other contact with Banks after June 16 in SHU. *See generally* ECF 1.

**C. SFF Hazelton and FCI Waseca**

According to the Complaint, the next thing that happened was on July 6, 2023, when Plaintiff was transferred to SFF Hazelton in West Virginia. *Id.* at ¶ 73. On her trip there, another inmate told Plaintiff that while Plaintiff was in the SHU Banks had "started messing with someone else" and that eventually "officials came into the pod and walked Officer Banks off the pod…." *Id.* at ¶ 74. Plaintiff became "worried about him," and she tried to contact Banks but received no response. *Id.* at ¶ 76.

Plaintiff was housed in SFF Hazelton until November 2023, when she was transferred back to FTC OKC. *Id.* at ¶ 78. While she was in West Virginia, Plaintiff did not report Banks' abuse because she feared getting in trouble. *Id.* at ¶ 77.

Later in November, Plaintiff was transferred to FCI Waseca in Minnesota. *Id.* at ¶¶ 78, 80. While there, Plaintiff claims another BOP employee, "Officer Brant," began "flirting with her and giving her special attention that felt like sexual harassment and like he was testing to see how far he could go with her." *Id.* at ¶ 81.

4

### D. Reporting Banks' conduct while at FCI Greenville

In January 2025, Plaintiff was transferred to a lower security facility at FCI Greenville. *Id.* at ¶ 82. It was there that Plaintiff reported Banks' behavior to agents with BOP's Special Investigative Service ("SIS"), who were there to interview her about Brant. *Id.* at ¶¶ 83, 84. She also spoke to a BOP psychiatrist about it. *Id.* at ¶ 84. She did not, however, disclose Banks' identity. *Id.* Plaintiff claims she "had come to realize that Officer Banks abuse of incarcerated women was widespread, and that she was not the only one he had abused," but she still was "scared that she and Officer Banks would both get in trouble if she gave his name." *Id.* at ¶ 84.

Plaintiff did not inform anyone at BOP that it was Banks that had sexually assaulted her until February or March 2025, when she revealed Banks' name to SIS, who assured her that they would look into her allegations. *Id.* at ¶ 85. And evidently they did, because on October 7, 2025, agents with the DOJ Office of Inspector General ("OIG") interviewed Plaintiff as part of an investigation of Banks. *Id.* at ¶ 86.

On January 6, 2026, Plaintiff was released from FCI Greenville and transferred to a Residential Reentry Center (or halfway house) in Milwaukee, Wisconsin. *Id.* at ¶ 88.

## II. Plaintiff's Administrative Claim

As Plaintiff indicates, she submitted an administrative claim to BOP, and BOP denied it on October 1, 2025. *Id.* at ¶ 16. BOP denied the claim because it was filed more than two years after Banks last allegedly abused Plaintiff and therefore was untimely. *See* Declaration of Johnna Burrows, included herewith, ¶ 13; Decl. Exh. 4.

As explained *infra* at pp. 10–11, under BOP regulations, Plaintiff was required to submit her administrative claim via mail or physical delivery to the BOP's regional office for the region in which the loss or injury occurred. Here, the relevant BOP regional office was the South

Central Regional Office ("SCRO"), which is located at United States Armed Forces Reserve Complex, 344 Marine Forces Drive, Grand Prairie, Texas. *Id.* at ¶¶ 5–6.

Based upon records now in BOP's possession, Plaintiff attempted to submit her Standard Form 95 Claim for Damage, Injury, or Death ("SF-95"), which was dated May 23, 2025, on that same day by email to a general mailbox associated with the SCRO and by certified mail incorrectly addressed to 4211 Cedar Springs Road, Suite 300, in Dallas, Texas. *Id*. at ¶ 8; Decl. Exh. 1. Although at one point the SCRO was located at this address, since 2013 it has been housed at the U.S. Armed Forces Reserve Complex, 344 Marine Forces Drive, Grand Prairie, Texas. Burrows Decl., ¶ 6. BOP does have an office at the Dallas address anymore. *Id.*

On June 3, 2025, Plaintiff attempted to submit a supplement, again by email and to the same incorrect mailing address by certified mail. *Id.* at ¶ 10; Decl. Exh. 2. This is the date Plaintiff refers to in Complaint as the time when she presented her administrative claim. ECF 1 at ¶ 16. However, on June 30, 2025, evidently realizing she had not sent it to the correct address, Plaintiff again sent her SF-95 by certified mail to the SCRO, this time at the correct address of United States Armed Forces Reserve Complex, 344 Marine Forces Drive, Grand Prairie, Texas. Burrows Decl., ¶ 11; Decl. Exh. 3. The SCRO received it on July 3, 2025. *Id.* The cover letter accompanying Plaintiff's SF-95 acknowledged that the claim had not previously been sent to the right mailing address. Decl. Exh. 3 at 1.

According to her SF-95, Plaintiff's claim was "for damages due to sexual harassment and sexual assaultive conduct she experienced while incarcerated at FTC Oklahoma City" in "June 2023." *Id.* at 3. More specifically, "[f]or a few weeks in June 2023, Officer Banks sexually harassed and sexually assaulted [Plaintiff] on multiple occasions." *Id.* at 5. The SF-95 lacks any

allegations concerning behavior of BOP employees any time after June 16, 2023, or any place other than FTC OKC. *Id.* at 3–6.

### III. Plaintiff's civil case

Plaintiff then filed this action on March 27, 2026. ECF 1. Suing under the FTCA, Plaintiff seeks money damages under five legal theories: assault, battery, negligence, negligent infliction of emotional distress, and negligent hiring and supervision. *Id.* at ¶¶ 96–105, 106–114, 115–127, 128–140, 141–154.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint, accepting as true all well-pleaded factual allegations and drawing reasonable inferences in favor of the plaintiffs. *Bultasa Buddhist Temple of Chicago v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017). In making its determination, the Court may look beyond the allegations of the complaint. *See Johnson v. Apna Ghar, Inc.*, 330 F.3d 999, 1001 (7th Cir. 2003). When jurisdictional allegations are questioned, the plaintiff has the burden of proving that the jurisdictional requirements have been met. *See Kontos v. United States Dept. of Labor*, 826 F.2d 573, 576 (7th Cir. 1987). The Court must dismiss the action if it determines, at any time, that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

When a defendant seeks dismissal based on failure to exhaust administrative remedies, it is properly treated as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Thompson v. Cope*, 900 F.3d 414, 425 (7th Cir. 2018). Such a motion challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, a court must accept the well-pleaded facts of a complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption. *Adams*, 742 F.3d at 728; *see also Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). Courts may also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013); *see also Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003) ("[I]n resolving a motion to dismiss, the district court is entitled to take judicial notice of matters in the public record."). This includes information pertinent to a plaintiff's failure to exhaust administrative remedies. *See, e.g., Palay*, 349 F.3d at 425 n.5 (finding district court entitled to take judicial notice of administrative tort claim document); *Feistel v. U.S. Postal Serv.*, No. 08-C-75, 2008 WL 2048278, at *1 (E.D. Wis. May 12, 2008) (relying on agency declaration concerning plaintiff's failure to timely exhaust as "a matter of agency record with significant reliability"); *Sagaitis v. W. Bend Ins. Co.*, 790 F. Supp. 3d 744, 748 n.1 (W.D. Wis. 2025) (taking judicial notice of documents from administrative proceedings, including the charge document, decision, and notices); *Anderson v. Centers for New Horizons, Inc.*, 891 F. Supp. 2d 956, 959 (N.D. Ill. 2012) (taking judicial notice of EEOC charge and Illinois Department of Human Rights records).

8

**ARGUMENT**

**I. The Court Should Dismiss the Complaint in Its Entirety Under Rule 12(b)(6) for Failure to Exhaust Administrative Remedies.**

A tort claim against the United States is forever barred unless presented within two years after the claim accrues. 28 U.S.C. § 2401(b). In this case, BOP did not properly receive Plaintiff's SF-95 until July 3, 2025, which was more than two years after her last encounter with Banks. All of Plaintiff's claims are, therefore, barred.

**A. The exhaustion requirement**

As an incarcerated person, Plaintiff is a "prisoner" for purposes of the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e ("PLRA"). 42 U.S.C. § 1997e(h). The PLRA requires prisoners to exhaust administrative remedies before filing a federal claim about prison conditions. *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022). It provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Seventh Circuit has for decades required strict adherence to the PLRA's exhaustion requirements. *Crouch*, 27 F.4th at 1320 (quoting *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)). The PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Crouch*, 27 F.4th at 1320 (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). This specifically includes claims brought under the FTCA. *Porter*, 534 U.S. at 524.

As a sovereign, the United States "remains immune except as it consents to be sued, and the terms of its consent as specified by Congress define the court's jurisdiction to entertain suit." *Lojuk v. Quandt*, 706 F.2d 1456, 1460–61 (7th Cir. 1983). The FTCA is a limited waiver of

9

sovereign immunity from liability in tort for suits brought against it in federal court. *Id.* It

permits a person to bring suit in federal court against the United States:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Buechel v. United States*, 746 F.3d 753, 758 (7th Cir. 2014) (quoting 28 U.S.C. § 1346(b)(1)). As

a limited waiver of the federal government's sovereign immunity, the FTCA's procedural rules

must be "strictly construed." *Lane v. Pena,* 518 U.S. 187, 192 (1996). Thus, like any other

federal tort claimant, an inmate may not bring a tort action against the United States unless she

has first presented her claim to the appropriate federal agency, and that agency has denied the

claim or failed to issue a decision within six months of the date the claim was presented.

*Buechel*, 746 F.3d at 758 (citing 28 U.S.C. § 2675(a) and 28 C.F.R. § 14.2(a)); *McNeil v. United*

*States*, 508 U.S. 106, 113 (1993).

Importantly for this case, a claim must be presented to the appropriate federal agency

within two years after it accrues, or it is "forever barred." 28 U.S.C. § 2401(b); *see also Kanar v.*

*United States*, 118 F.3d 527, 528 (7th Cir 1997) ("No one may file suit under the Federal Tort

Claims Act without first making an administrative claim."); *Censke v. United States*, 947 F.3d

488, 489 (7th Cir. 2020) ("Before bringing his claim to court, [BOP inmate] had to comply with

the FTCA's administrative notice requirements."). This requirement cannot be waived. *Best*

*Bearings Co. v. United States*, 463 F.2d 1177, 1179 (7th Cir. 1972). To properly exhaust

remedies, "a prisoner must file complaints and appeals *in the place, and at the time*, the prison's

administrative rules require." *Dole*, 438 F.3d at 809 (emphasis added).

## B. BOP's administrative claim processing regulations

Federal regulations spell out the steps a potential plaintiff must take before filing suit. *Thompson v. United States*, No. 24-1495, 2024 WL 4973309, at *2 (7th Cir. Dec. 4, 2024), cert. denied, 146 S. Ct. 897 (2025) (citing 28 C.F.R. § 14.2(a)). The claim processing regulations pertaining to BOP are set forth at 28 C.F.R. §§ 543.30-.32. *See Censke*, 947 F.3d at 489.

An inmate must "either mail or deliver the [administrative] claim to the regional office in the region where the loss or injury occurred." 28 C.F.R. § 543.31(c); *see also* U.S. Department of Justice, Federal Bureau of Prisons Program Statement 1320.07, *Federal Tort Claims Act*, available at https://www.bop.gov/policy/progstat/1320.07.pdf at 4 (last visited July 7, 2026). The BOP's regional offices and mailing addresses are identified on BOP's website. 28 C.F.R. § 543.31(c); *see also* https://www.bop.gov/locations/regional_offices/scro/ (identifying the SCRO physical and mailing addresses at the US Armed Forces Reserve Complex at 344 Marine Forces Drive in Grand Prairie, Texas) (last visited July 7, 2026).[1]

## C. Plaintiff's SF-95 was untimely.

In her SF-95, Plaintiff focused on Banks' conduct between June 1 and June 16, 2023. Those are the dates her claims accrued, and they are barred because BOP did not receive Plaintiff's SF-95 until July 3, 2025, more than two years later.

### 1. Plaintiff's claims accrued by June 16, 2023.

Although state law provides the substantive basis for Plaintiff's causes of action in an FTCA case, federal law sets forth the statute of limitations and controls when such a claim

---

[1] If an inmate has properly filed a claim, she will receive an acknowledgement letter and a claim number. 28 C.F.R. § 543.32(a). The claim will then be investigated and reviewed by the regional counsel or their designee. 28 C.F.R. § 543.32(c)-(d). If the claim is denied, the inmate may seek reconsideration. 28 C.F.R. § 543.32(g). If dissatisfied with the final agency action, the inmate may then file suit in federal court. *Id*. If the claim is not resolved by the regional counsel within six-months, the inmate may presume that the claim was denied and thus may file suit in federal court. 28 C.F.R. § 543.32(i).

11

accrues. *Fisk v. United States*, 657 F.2d 167, 170 (7th Cir. 1981). Thus, "[i]f the plaintiff has a cause of action against the Government under state law, federal law then controls as to whether the plaintiff has timely instituted his suit to recover on that cause of action." *Id.*

In the Seventh Circuit, an "FTCA claim accrues when either: 1) the individual becomes subjectively aware of the government's involvement in the injury, or (2) the individual acquires information that would prompt a reasonable person to inquire further into a potential government-related cause of the injury, whichever happens first." *P.W. by Woodson v. United States*, 990 F.3d 515, 519 (7th Cir. 2021). In other words, an FTCA claim accrues when the "individual actually knows enough to tip him off that a governmental act (or omission) may have caused his injury," or "a reasonable person in the individual's position would have known enough to prompt a deeper inquiry." *Blanche v. United States*, 811 F.3d 953, 958 (7th Cir. 2016) (quoting *Arroyo v. United States,* 656 F.3d 663, 669 (7th Cir. 2011)). A plaintiff does not need to know the full extent or severity of his injury in order for a claim to start accruing under the FTCA. *Devbrow v. Kalu*, 705 F.3d 765, 768 (7th Cir. 2013).

Plaintiff's injury and the government's relation to it were both obvious at the time Banks assaulted Plaintiff. Plaintiff's injuries do not arise from medical malpractice or fraud, where they may not be discoverable until some later time. Rather, Plaintiff claims she was groomed and eventually sexually assaulted by someone she knew to be a federal employee. Indeed, she asserts in the Complaint that she "did not—and could not—consent for a sexual encounter and that any such interaction would be sexual assault." ECF 1 at ¶ 101. And by mid-June Plaintiff had learned that two other inmates had been "abused" and "sexually assaulted" by Banks, as well. *Id.* at ¶¶ 64, 67. In short, based on the Complaint, Plaintiff was subjectively aware she had been injured by a government employee. Even if Plaintiff was not subjectively aware, any reasonable person

in her position would have known enough to prompt deeper inquiry after being groped by a prison guard in a closet and digitally penetrated in a concealed office. Thus, regardless of whether it is evaluated subjectively or objectively, any tort claims arising from Bank's predatory sexual harassment and assault of Plaintiff between June 1 and June 16, 2023, accrued on those same days. *See Roe v. United States*, 839 F. App'x 836, 844 (5th Cir. 2020) ("Roe was aware that he had a potential cause of action for negligence *at the time of the sexual assault*.") (emphasis added). Plaintiff delayed reporting her abuse because she cared for Banks and "felt the need to protect him even though he had abused her and was afraid of retaliation." ECF 1 at ¶ 69; *see also id.* at ¶ 77, 79. But her mixed feelings do not toll accrual; they do not change the fact that Plaintiff knew or should have known in the first half of June 2023 that Banks had sexually assaulted her.

### 2. The SCRO received Plaintiff's SF-95 on July 3, 2025.

Because her claims accrued on June 16, 2023, at the latest, Plaintiff was required to submit her SF-95 to the SCRO (the regional office for the region where the incidents occurred) by June 16, 2025. *See* 28 U.S.C. § 2401(b); 28 C.F.R. § 543.31(c); *see also Bailey v. Schneider*, No. 3:20-CV-00802-GCS, 2023 WL 2631860, at *7 (S.D. Ill. Mar. 24, 2023) ("An inmate seeking to bring a claim under the FTCA must first mail the appropriate administrative claim form to the Regional Office in the region where the claim occurred.") (citing 28 C.F.R. § 543.31(c)); *Donovan v. Bureau of Prisons*, No. 07-C-105, 2008 WL 4603337, at *2 (E.D. Wis. Oct. 16, 2008) ("An inmate seeking to bring a claim under this section may file his claim by mailing the appropriate form, which is available at all BOP institutions, to the regional office in the region where the claim occurred."). The regulation allows physical delivery, too, so long as the SF-95 is received by the appropriate regional office—here, the SCRO—within two years. *See*

28 C.F.R. §§ 543.31(c), 543.32(a) (defining the presentment date as the day the appropriate BOP office receives the claim).

Because the FTCA is an "exception to the immunity the federal government ordinarily enjoys from tort actions," Congress is entitled to "make '[m]en ... turn square corners' before haling the government into court." *Smoke Shop, LLC v. United States*, 761 F.3d 779, 788 (7th Cir. 2014). Consequently, "[i]f [the government] attaches even purely formal conditions to its consent to be sued those conditions must be complied with." *Id.* (finding constructive notice of potential tort claim did not satisfy FTCA's presentment requirement); *see also Bellecourt v. United States*, 994 F.2d 427, 430 (8th Cir. 1993) (affirming dismissal of federal inmate's FTCA claim when inmate, intending to comply with the FTCA, submitted his claim to the associate warden instead of sending it to BOP by certified mail).

As noted above, Plaintiff attempted to submit her SF-95 several times without success, relying on a general email box (a method of submitting a claim not provided for in BOP's regulations or policies) and an incorrect mailing address.[2] These failed attempts occurred on May 23, 2025, and again on June 3, 2025. Apparently realizing her mistake, Plaintiff sent her administrative claim documents by certified mail to the SCRO at the correct mailing address on June 30, 2025, but this was too late given that her allegations were of conduct that occurred between June 1 and 16, 2023. In any event, the date BOP received the SF-95 at the proper the SCRO controls. BOP did not receive Plaintiff's SF-95 by certified mail until July 3, 2025, well outside the two-year window, and her claims against the United States are barred.

---

[2] For the reasons set forth *supra* on page 8, the United States respectfully requests that the Court take judicial notice of the Burrows Declaration and attached records from the administrative claim process.

### D. Plaintiff's SF-95 did not notify BOP of all the claims included in the Complaint.

Even if Plaintiff had timely presented her administrative claim, it did not include factual allegations sufficient to put BOP on notice of several incidents on which Plaintiff bases her claims in this case. As such, those unexhausted and may not be pursued in this case.

As noted above, Plaintiff alleges in her Complaint that Banks gave Plaintiff his personal email address, asked for pictures of her, and sent and received messages with Plaintiff's family members on multiple days, some of which included nude images of Plaintiff. ECF 1 at ¶¶ 48–52 & 56–57, 59–61. Plaintiff alleges that she was sent to the SHU for retaliatory purposes. *Id.* at ¶ 64. And Plaintiff alleges sexually inappropriate conduct by another BOP employee, "Officer Brant," occurring sometime between November 2023 and January 2025, at FCI Waseca in Minnesota. *Id.* at ¶¶ 80–83. Later in the Complaint, Plaintiff sweeps all her allegations into a bucket and asserts that the "acts and omissions of Officer Banks *and other BOP personnel*" constituted assault, batter, negligence, and intentional infliction of emotional distress. *Id.* at ¶¶ 98, 109, 117, 134 (emphasis added).

But Plaintiff did not present to BOP any tort claims based on these incidents by including "relevant facts in enough detail to alert the Bureau of Prisons to the presence of those claims" in her SF-95. *See Palay*, 349 F.3d at 425. Although an administrative claim need not "comply with every jot and tittle of the rules defining a 'claim,'" *Kanar v. United States*, 118 F.3d 527, 530 (7th Cir. 1997), it must provide "sufficient notice to enable the agency to investigate the claim." *Palay*, 349 F.3d at 426. If a cause of action is "fairly implicit in the facts" set forth in an SF-95, it will be considered "presented" for purposes of exhaustion. *Id.* Stated another way, "if the claim would have been apparent to a 'legally sophisticated reader' of the form, then [courts] will charge the agency with notice of that claim and deem it to have been exhausted." *Id.* This means

that "an inmate is required to plead sufficient facts [in the SF-95] to put the agency on notice of the claim so that it may investigate." *Buechel*, 746 F.3d at 760.

Here, Plaintiff's SF-95 lacks any factual allegations about anything that occurred after June 16, 2023. It is devoid of facts about incidents at FCI Waseca or anywhere other than FTC OKC. It only references Banks's conduct between June 1 and 16 at FTC OKC. Even a legally sophisticated reader would have no way of knowing, by reading Plaintiff's SF-95, that she wished to assert that Brant or anyone else other than Banks had committed any torts against her. *See Johnson v. United States*, No. 14 C 10461, 2016 WL 3387156, at *10 (N.D. Ill. June 20, 2016). Moreover, the SF-95 lacks any facts concerning Banks messaging with Plaintiff's family members or Plaintiff being sent to SHU in retaliation.

BOP therefore did not have notice that Plaintiff would assert tort claims arising out of the conduct of any BOP employee other than Banks, occurring at any time after June 2023, taking place at any facility other than FTC OKC, or involving the exchange of explicit messages and placing Plaintiff in SHU. Even if Plaintiff had timely presented her SF-95, she failed to exhaust any claims related to such conduct by Banks and any claims pertaining to or arising from conduct occurring after June 16, 2023, and they are forever barred.

## II.     The Court Lacks Jurisdiction Over Counts One, Two, Three, and Four of the Complaint Because Banks Was Not Acting Within the Scope of His Employment.

Setting aside the issue of exhaustion, most of the Complaint is also subject to dismissal for lack of subject matter jurisdiction because Plaintiff has not established an essential element of a meritorious FTCA claim; specifically, that Banks was acting within the scope of his employment when he sexually harassed and assaulted her.

In the "unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." *See Talignani v. United States*, 26 F.4th 379, 381 (7th Cir. 2022) (quoting

*Brownback v. King*, 592 U.S. 209, 217 (2021)). Accordingly, "failure to establish any element also eliminates the basis for subject matter jurisdiction." *Id.* (affirming dismissal for lack of jurisdiction where plaintiff failed to establish that tortfeasor was a federal employee as required by the FTCA). One of the elements of an FTCA claim is that the underlying acts must be committed by a federal employee "while acting *within the scope of his office or employment*." 28 U.S.C. § 1346(b) (emphasis added). Whether an employee is acting in the scope of his employment is determined by reference to state law. *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010); *Garcia v. United States*, 62 F.3d 126, 127 (5th Cir. 1995); *Henson v. NASA*, 14 F.3d 1143, 1147 (6th Cir. 1994); *St. John v. United States*, 240 F.3d 671, 676 (8th Cir. 2001); *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010); *Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011); *Hunter v. United States*, 825 F. App'x 699, 701 (11th Cir. 2020).

Oklahoma law governs Plaintiff's claims because the acts or omissions at issue occurred in that state. 28 U.S.C. § 1346(b)(1) (providing that the government waives sovereign immunity for the torts of its employees "if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred). Under Oklahoma common law, one "acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business." *Sheffer v. Carolina Forge Co., L.L.C.*, 306 P.3d 544, 550 (Okla. 2013); *Tuffy's, Inc. v. City of Okla. City*, 212 P.3d 1158, 1163 (Okla. 2009). In the law enforcement context, this means that employers are may be liable for acts constituting "abuses of lawful power" but not for "acts [that] are so extreme as to constitute a clearly unlawful

usurpation of power the officer did not rightfully possess." [3] *Barnes v. United States*, 707 F.

App'x 512, 517 (10th Cir. 2017) (citing *DeCorte v. Robinson*, 969 P.2d 358 (Okla. 1998). This is

usually a question of fact, but "where only one reasonable conclusion can be drawn from the

facts, the issue of whether an employee was within the scope of employment may be decided by

the court." *Sheffer*, 306 P.3d at 550–51.

As a general rule, an employee assaulting a third party is not within the scope of

employment for purposes of employer liability. *See N.H. v. Presbyterian Church (U.S.A.)*, 998

P.2d 592, 598 (Okla. 1999). This rule is subject to exceptions only if: "1) the act is fairly and

naturally incident to the employer's business; 2) the act occurs while the employee is engaged in

an act for the employer; or 3) the assault arises from a natural impulse growing out of or incident

to the attempt to complete the master's business." *Id.* at 598–99. Critically, it is not enough that

an assault occurred during employment-related activity; the act must actually be "done to

accomplish the assigned work." *Id.* at 599.

Oklahoma courts have grappled with this issue in a number of cases and found employers

liable for assaults or batteries by employees only when the employee was clearly acting in the

scope of their employment. For example, in *Rodebush By & Through Rodebush v. Oklahoma

Nursing Homes, Ltd.*, 867 P.2d 1241 (Okla. 1993), the Oklahoma Supreme Court held that a

nursing home employee was acting within the scope of his employment when he slapped a

combative Alzheimer's patient. *Id.* at 1246. The court observed that the nursing home "was in the

business of taking care of Alzheimer patients," it was known that "Alzheimer patients may be

combative," the employee "was assigned the duty of bathing residents," and that the employee

---

[3] This appears to reframe the general test for the law enforcement context. To the extent it is a different test, however, it should not apply because FTCA makes the United States liable to the same extent as a *private* person, not a state or local official.

was carrying out his assigned task of bathing the patient when he slapped him. *Id.* The employee also had not been trained that slapping patients would not be tolerated. *Id.* In short, the assault was "incident to some service being performed for the employer," and it arose "out of an emotional response to actions being taken for the employer." *Id.* at 1245.

The common theme in these types of cases is that the employees were actively engaged in assigned tasks in furtherance of the employer's interests and the assigned tasks had the potential to produce a natural impulsive or emotional response to commit an assault. *See also Chicago, R.I. & P. Ry. Co. v. Radford*, 129 P. 834, 838 (Okla. 1913) (railroad liable when employee responsible for enforcing fare collection publicly accused a passenger that refused to pay of forgery and detained him until the sheriff arrived to arrest him); *Ada–Konawa Bridge Co. v. Cargo*, 21 P.2d 1 (Okla. 1932) (toll bridge company liable when employee responsible for enforcing and collecting tolls shot a driver who blew the toll gate); *Russell-Locke Super-Service v. Vaughn*, 40 P.2d 1090 (Okla. 1935) (car battery seller and servicer liable when employee tasked with repossessing a car battery injured the plaintiff who was interfering with the employee's repossession efforts); *Mistletoe Express Service v. Culp*, 353 P.2d 9 (Okla. 1959) (freight common carrier liable when employee responsible for delivering freight assaulted plaintiff who refused to accept delivery of a damaged product); *Baker v. Saint Francis Hosp.*, 126 P.3d 602 (Okla. 2005) (daycare center liable when employee struck a crying baby because the employee was responsible for caring for crying infants and her conduct involved an emotional response to actions being taken for the employer to the extent which was trying to quiet the child).

The outcome is the same in the law-enforcement context. *See, e.g., Nail v. City of Henryetta*, 911 P.2d 914, 915, 918 (Okla. 1996) (noting that a jury could reasonably find that a

police officer acted in the scope of his employment when he arrested the plaintiff, took him to jail, and in the process shoved him to the ground and injured his face and body); *DeCorte*, 969 P.2d at 362 (affirming jury's determination that officer who arrested plaintiff, handcuffed him, placed him in a squad car, and then grabbed him by the throat and struck him, causing a herniated disc, was acting within the scope of his employment); *Barnes*, 707 F. App'x at 518 (case agent employed by ATF acted within the scope of his employment when he testified falsely against the plaintiff in her criminal case).

But where a tortfeasor employee's conduct clearly is not related to an assigned responsibility or in furtherance of the business's interest, Oklahoma appellate courts decline to extend liability to the employer. For example, in *Warren v. United States Specialty Sports Ass'n*, 138 P.3d 580 (Okla. Civ. App. 2006), the court of appeals declined to hold a sports association liable for an assault by one of its executives where, *inter alia*, the confrontation occurred away from the sports field, was "not fairly and naturally incident to [association]'s business of sanctioning sports tournaments," occurred when the employee "was not engaged in an act for [the association] and was not furthering any purpose of [the association]," and the employee "did not confront Plaintiffs in order to accomplish work assigned to him by [the association]." *Id.* at 587. This decision naturally flows from Oklahoma Supreme Court precedent. *See, e.g., Hill v. McQueen*, 230 P.2d 483 (Okla. 1951) (seed company not liable when manager assaulted a former independent sales contractor during an argument over a disputed debt); *Oklahoma Ry. Co. v. Sandford*, 258 P.2d 604 (Okla. 1953) (bus company not liable when bus driver exited his bus and assaulted another driver he believed was drunk); *Tulsa General Drivers, Warehousemen, and Helpers Union, Local No. 523 v. Conley*, 288 P.2d 750 (Okla. 1955) (union not liable where union employee followed someone employee thought crossed the picket line for four and a half

blocks and beat him with a nail-studded board); *Allison v. Gilmore, Gardner & Kirk, Inc.*, 350 P.2d 287 (Okla. 1960) (fuel delivery company not liable where truck driver who was employed to drive truck and deliver fuel assaulted a person the driver found on top of his truck).

When it comes to sexual assault by employees specifically, Oklahoma law is clear. Oklahoma courts have "consistently refused to find that sexual assaults by employees occurred within the scope of employment." *Smith v. Hedgecock*, No. 18-CV-046-JHP, 2018 WL 3478893, at *4 (E.D. Okla. July 19, 2018). Indeed, the Oklahoma Supreme Court has held that "sexual predatory conduct [is] outside the scope of employment *as a matter of law*" when "no reasonable person would conclude that predatory sexual conduct was part of, and in furtherance of," the employer's business. *Schovanec v. Archdiocese of Oklahoma City*, 188 P.3d 158, 161 (Okla. 2008) (involving an ecclesiastical organization) (emphasis added); *see also N.H. v. Presbyterian Church (U.S.A.),* 998 P.2d 592, 599–600 (Okla. 1999) (finding minister's sexual abuse of children during recreational activities meant to recruit new church members outside the scope of employment as a matter of law).

In *N.H.*, the court distinguished the *Rodebush* case, noting that it involved "an impulsive response to an attempt to complete" an employment-related task, namely "the patient's bath." *Id.* at 599. No reasonable person could conclude, however, that sexually abusing children was part of the minister's employment. Indeed, the court noted, "no one contends that sexual acts with minors are in any manner authorized or condoned by the national organization. Assuredly, the acts are condemned by the Presbyterian Church" and "anathema to the national organization's religious practices." *Id.* Obviously "[m]inisters should not molest children," and if they do, "it is not a part of the minister's duty nor customary within the business of the congregation." *Id.* The minister's conduct was for "personal gratification," an "abuse [of] his position," and an

"exploit[ation of] his special relationship with the children." *Id.* So too in *Schovanec*, the court found no evidence that the minister's predatory sexual conduct was "a means of advancing the denomination's business" or otherwise "furthered a particular denominational/religious goal or religious practice…." 188 P.3d at 161. Indeed, the denomination specifically "condemns predatory sexual assault." *Id.*

This rule has been applied in employer-employee relationships beyond religious institutions, including in the corrections context. *See, e.g., Koch v. Juber*, No. CIV-13-0750, 2014 WL 2171753, at *4-5 (W.D. Okla. May 23, 2014) (correction officers' alleged sexual assault of inmates was outside the scope of employment); *Hyatt v. Board of Regents of Oklahoma Colleges*, No. CIV-14-511, 2015 WL 521112, at *4 (W.D. Okla. Feb. 9, 2015) (alleged sexual assault perpetrated by security personnel at juvenile rehabilitation program was outside the scope of employment); *Gray v. Acadia Healthcare Co., Inc.*, No. 19-CV-00338-JFH, 2020 WL 5996418, at *5 (E.D. Okla. Oct. 9, 2020) (residential psychiatric treatment center employees were not acting in the scope of their employment, as a matter of law, when sexually assaulting patients).

Applying Oklahoma law to the facts of this case, as a matter of law, no reasonable person could conclude that Banks's alleged predatory behavior and sexual assault of Plaintiff fell within the scope of his employment. As Plaintiff acknowledges, BOP employees are statutorily prohibited from engaging in sexual acts with inmates. ECF 1 at ¶ 17. Federal law specifically criminalizes sexual contact with inmates. 18 U.S.C. § 2243(b). And pursuant to the Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. § 30307, BOP enacted policies making it crystal clear that staff are strictly prohibited from engaging in any sexual contact with inmates. *See* U.S. Department of Justice, Federal Bureau of Prisons Program Statement 3420.14, *Standards of*

*Employee Conduct*, available at https://www.bop.gov/policy/progstat/3420_014.pdf (last visited July 7, 2026).

In fact, BOP policy expressly forbids the very type of conduct Plaintiff alleges Banks engaged in:

> Employees <u>may not show partiality toward, or become emotionally, physically, sexually, or financially involved with inmates</u>; former inmates; or family members, associates, or close friends of inmates or former inmates.

> \*\*\*

> An employee <u>may not engage in</u>, or allow another person to engage in, <u>sexual behavior with an inmate. There is no such thing as consensual sex between employees and inmates.</u>

> \*\*\*

> Title 18, U.S. Code Chapter 109A provides penalties of up to life imprisonment for sexual abuse of inmates where force is used or threatened. <u>Sexual contact is defined as the intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person.</u>

> Penetration is not required to support a conviction for sexual contact. All allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to the appropriate authorities for prosecution. <u>Employees are subject to disciplinary action, up to and including removal, for any inappropriate communication, contact, sexual behavior, or relationship with inmates</u>; former inmates; <u>or family members, associates, or close friends of inmates</u> or former inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to discipline up to and including removal for misconduct of a sexual nature.

> An employee <u>may not offer or give to inmates</u>; former inmates; or family members, associates, or close friends of inmates or former inmates, <u>any gift, article, favor, or service that is not authorized in the performance of the employee's duties.</u>

*Id.* at 7–8 (emphasis added).

Based on BOP's regulations, it is "inconceivable that [Banks's] acts were of the nature of those which he was hired to perform." *See N.H.*, 998 P.2d at 599. The regulations categorically

prohibit showing particular interest in or preference for Plaintiff, giving her gifts, sharing messages with her family (especially those of a sexually explicit nature), and ultimately sexually abusing her. BOP's regulations also describe the impacts on continued employment should employees engage in prohibited sexual acts, *i.e.*, discipline up to and including termination. And they set forth the criminal penalties for engaging in such acts. Consequently, no reasonable person could conclude that these actions were part of Banks's employment. *See id.*; *see also Shovanec*, 188 P.3d at 161 (relying on fact that employer specifically "condemns predatory sexual assault.").

Moreover, no reasonable person could conclude that Banks's actions were in furtherance of BOP's mission, which includes fostering a "humane and secure environment" for federal inmates. *See* https://www.bop.gov/news/pdfs/bop_mission_vision_core_values.pdf (last visited July 7, 2026); *see also Koch*, 2014 WL 2171753, at *5 (prison guards' sexual assaults of inmates had not "furthered a particular [correctional] goal") (quoting *Schovanec*, 188 P.3d at 161). Indeed, Plaintiff's Complaint lacks any factual allegations that Banks undertook his actions "to accomplish the assigned work. *See N.H.*, 998 P.2d at 599. Following an inmate into a closet and groping her is not incident to BOP's correctional mission, nor is it a natural impulse or emotional response expected in the course of performing the duties of a laundry supervisor or unit officer. Similarly, no correctional goal was furthered by Banks inviting Plaintiff to his office after hours, blocking the security camera, and sexually assaulting Plaintiff. The mere fact that Banks was a BOP employee and that these incidents occurred in the prison are not enough, on their own, to establish that Banks acted within the scope of his employment as they had absolutely no relation to Banks' responsibilities or BOP's mission. *See id.* Like the minister in *N.H.*, Banks was acting

solely for his own prurient interests and at no time was he acting in accordance with his assigned tasks or to the benefit of BOP.

Because no reasonable person could conclude that Banks was acting within the scope of his employment when he sexually harassed and assaulted Plaintiff, Plaintiff's claims against the United States based on his conduct (assault, battery, negligence, and intentional infliction of emotional distress) fail as a matter of law and should be dismissed.

### III. Count Five of the Complaint Does Not State a Plausible Claim for Negligent Hiring and Supervision.

Finally, although Plaintiff's remaining claim for negligent hiring and supervision does not depend on whether Banks' conduct fell within the scope of employment, it is dependent on whether and when BOP officials were aware of Banks' conduct. *See N.H.*, 998 P.2d at 600 (noting that even if vicarious liability is not established, an employer may be "liable, if—at the critical time of the tortious incident—, the employer had reason to believe that the person would create an undue risk of harm to others."). Importantly, the employer must have "*prior knowledge* of the [employee's] propensity to commit the very harm for which damages are sought." *Id.* (emphasis added).

In her fifth claim for relief, Plaintiff contends that the United States "knew or should have known that Officer Banks was sexually inappropriate with incarcerated women and had been in the past, including based on reports from other women and actions by Officer Banks that were observable to others." ECF 1 at ¶ 149. But this conclusion lacks factual support in the Complaint. It is instead based on Plaintiff's belief that prison officers have a general proclivity toward sexually abusing inmates. *See id.* at ¶¶ 143, 146, 147, 148. The fact that inmates elsewhere may have been abused by other BOP employees does not mean that BOP had prior knowledge that *Banks* had a propensity to sexually abuse inmates. The Complaint lacks any facts supporting the

notion that BOP officials had reason to know that Banks himself may sexually abuse inmates before June 2023, when Plaintiff met him. And while Plaintiff does allege that some of Banks' milder behavior—like showing her favor and talking about messages from family members— occurred in the open where others could observe, she does not contend that anyone knew about him sexually assaulting her in the closet or office before she reported it in the spring of 2025.

Indeed, Plaintiff explains in detail that she delayed reporting Banks' behavior for months because she cared for him and was worried about reprisal. Likewise, although Plaintiff alleges that another inmate confided in Plaintiff that Banks also sexually assaulted her, Plaintiff alleges that the other inmate did not do so until *after* Banks assaulted Plaintiff and, more importantly, Plaintiff does not allege that this other inmate reported Banks' behavior to prison officials. The same applies to the inmate Plaintiff overheard in another cell saying that Banks had assaulted her, as well.

In any event, even assuming BOP officials knew at or shortly after the time of the incidents that Banks was having inappropriate sexual contact with Plaintiff or other inmates, Plaintiff's allegations wholly fail to establish that BOP knew it was reasonably foreseeable to occur *beforehand* such that they could have taken action to prevent it. Accordingly, based on the well-pleaded facts of the Complaint, Plaintiff fails to state a claim for relief based on negligent hiring and supervision, and this claim should be dismissed under Rule 12(b)(6).

## CONCLUSION

For these reasons, the United States respectfully requests that the Court dismiss the Complaint for failure to exhaust administrative remedies, failure to state a claim, and/or lack of jurisdiction, pursuant to Rules 12(b)(1) and 12(b)(6), and for such other and further relief as is just and equitable.

Dated at Milwaukee, Wisconsin this 15th day of July, 2026.

Respectfully submitted,

*s/ Luke Sinclair*
LUKE P. SINCLAIR
Assistant United States Attorney
Wisconsin Bar No. 1087786
Office of the United States Attorney
Eastern District of Wisconsin
Federal Building, Room 530
517 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: (414) 297-1700
Fax: (414) 297-4394
Email: luke.sinclair@usdoj.gov
*Attorneys for Defendant*

27