UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JANE ROE,

Plaintiff,

v.

Case No. 2:26-cv-504

UNITED STATES OF AMERICA,

Defendant.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

## TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................................3

I. STATEMENT OF FACTS ....................................................................................5

II. LEGAL STANDARD.............................................................................................6

III. ARGUMENT ..........................................................................................................7

A. Plaintiff Exhausted Her Administrative Remedies. .........................................7

1. BOP Received Plaintiff's Administrative Claim Within the Statute of Limitations. ...........................................................................................7

2. Plaintiff's Administrative Claim Sufficiently Put BOP on Notice. ...........13

B. Plaintiff Sufficiently Alleged that Officer Banks Was Acting Within the Scope of His Employment; Regardless, Scope of Employment Is a Fact-Bound Determination Unsuitable for Resolution on a Motion to Dismiss. ...........14

1. Oklahoma Law Recognizes that the Scope of Employment of a Law Enforcement Officer or a Private Person Is a Fact-Bound Determination Unsuitable for a Motion to Dismiss. .................................15

2. Officer Banks Acted Within the Scope of His Employment Because His Tortious Conduct Was Accomplished Through Abuse of Power Lawfully Vested in a BOP Officer and Was Incidental to His Work Responsibilities. ........................................................18

(a) Under Oklahoma Law, Officer Banks Acted Within the Scope of His Employment as a Law Enforcement Officer. ...........18

(b) Under Oklahoma Law Applicable to Private Persons, Officer Banks Acted Within the Scope of His Employment. ........21

C. Plaintiff Sufficiently Alleged Negligent Hiring and Supervision. .........................29

IV. CONCLUSION ....................................................................................................32

## INTRODUCTION

When Plaintiff Jane Roe arrived at the Bureau of Prisons' ("BOP") Federal Transfer Center Oklahoma City ("FTC Oklahoma City") in May 2023, she expected a quick, uneventful stay before a transfer to her next, more permanent facility to serve her federal sentence. Instead, she suffered sexual harassment and assault by Defendant United States of America's employee Officer Dawone Banks while he acted as the supervisor of her housing unit as well as when she went to work at her job in the prison. Ms. Roe suffered physical injuries as a result of the assault and continues to suffer mental and emotional anguish. Despite Officer Banks' egregious actions, Defendant argues that the United States cannot be held liable. Defendant's arguments are unavailing.

Defendant first contends that the Court may not consider Plaintiff's Complaint because of the method she used to submit her administrative claim to the correct BOP office. The governing regulation provides that claimants "may either *mail or deliver* the claim to the regional office in the region where the loss or injury occurred." 28 C.F.R. § 543.31(c) (emphasis added). Defendant concedes that BOP received the claim and does *not* contend that the method of delivery impeded BOP's ability to consider settling the claim. Nevertheless, based on an unsupported construction of the terms "mail or deliver," Defendant contends that Ms. Roe was required to physically mail or physically deliver her claim. The Court should reject this argument because it lacks legal support and runs contrary to the language and intent of the FTCA and the BOP's own regulations.

Defendant next contends that Ms. Roe's claim fails because Officer Banks was acting outside the scope of his employment when he groomed and then assaulted Ms. Roe in a BOP facility. Defendant does not argue that Plaintiff did not plead facts sufficient to show that she was assaulted, battered, that she was injured as a result of negligence, or that she suffered

intentional infliction of emotional distress. Instead, Defendant argues that Officer Banks' sexual assault of Ms. Roe was outside the scope of his employment as a matter of law. However, Defendant misreads the underlying state law, relies on non-controlling interpretations of state law, and discounts Plaintiff's allegations showing that Defendant knew that sexual abuse by guards, including by Officer Banks, was rampant and infrequently punished, allowing it to continue systemwide without consequence. To the extent that BOP disputes that it had received other complaints and/or was aware of Officer Banks' conduct, this is a factual issue which cannot be resolved on a motion to dismiss.

Plaintiff's allegations adequately state a claim for respondeat superior under Oklahoma common law. Officer Banks was acting within the scope of his employment as a unit officer and laundry supervisor when he battered and assaulted Ms. Roe during his work hours, in his office while supervising out-of-cell time he allowed as a special privilege for laundry workers like Ms. Roe, and then again in a laundry closet while supervising her work for the laundry department. Plaintiff's complaint adequately alleges that Officer Banks' abuse of her was inextricably tied to the execution of his assigned responsibilities. If accepted, Defendant's view of the law would leave Ms. Roe and anyone else sexually assaulted by federal officers in Oklahoma while in the care of the government without a remedy against the United States. To the extent that Defendant disputes that Officer Banks' purpose and motive in his abusive conduct could not have been in any part work-related, this is a question of fact that cannot be resolved on a motion to dismiss. *See Baker v. Saint Francis Hosp.*, 126 P.3d 602, 606-07 (Okla. 2005).

Defendant also argues that Plaintiff did not state a claim for negligent hiring and supervision because Defendant had no notice of Officer Banks' actions or tendency to be sexually inappropriate with incarcerated women. To the contrary, Plaintiff alleged that Officer

Banks had previously sexually abused other women at the prison. Dkt. 1 ("Complaint"), ¶ 70. Plaintiff also alleged—and Defendant concedes—that multiple of Officer Banks' actions were out in the open in areas with surveillance cameras. *Id.* ¶¶ 43, 45, 51. Officials reviewing this footage saw or should have seen Officer Banks' escalating inappropriate and prohibited attention to Plaintiff. Further, Plaintiff alleged that prior to the assault and battery she gave her family member Officer Banks' personal email address to send pictures of her at his request; this communication would have been either on a monitored call or in a monitored email, which alerted or should have alerted BOP to Officer Banks' inappropriate requests. *Id.* ¶¶ 48-50. Finally, Plaintiff alleges that Officer Banks exploited a known vulnerability in BOP facilities by assaulting her in a blind spot the BOP should have corrected. *Id.* ¶¶ 21, 54. Together, these allegations are sufficient to survive a motion to dismiss.

Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss. In the alternative, if the Court grants the motion, Plaintiff requests leave to amend.

## I. STATEMENT OF FACTS

Plaintiff entered BOP custody in 2021. Compl. ¶ 37. After serving part of her sentence at the Federal Correctional Institution Pekin ("FCI Pekin"), she was transferred to BOP's Federal Transfer Center in Oklahoma City ("FTC Oklahoma City") on or around May 24, 2023, to await transfer to another facility. *Id.* ¶¶ 37-38. Shortly after Plaintiff's arrival at FTC Oklahoma City, Officer Dawone Banks—who was the laundry department supervisor and one of the unit officers on her housing unit—approached Plaintiff and other women on the unit to recruit them to work for him in laundry. *Id.* ¶¶ 40-42. In the open on the unit, which had surveillance cameras, he told Plaintiff he "takes care of" his laundry workers and gives them special privileges like snacks and thirty extra minutes of evening out-of-cell time. *Id.* ¶ 41, 43-44, 51.

Unit officers have total control over hiring and firing of laundry workers and can fire people if they do not follow the officer's instructions. *Id.* ¶ 36. In his dual role as laundry supervisor and unit officer, Officer Banks was frequently the sole supervisor for the unit. *Id.* ¶ 42. Officer Banks made good on his promises of special privileges, gave Plaintiff gifts, talked to her about his personal life, and would shout to her across the unit. *Id.* ¶¶ 43-45. At least once, while doing rounds on the unit, Officer Banks watched Plaintiff while she was showering. *Id.* ¶ 47. He gave her his personal email address and asked for pictures of her, which she had a family member send, including one where she was topless. *Id.* ¶¶ 48-49, 50, 52. Officer Banks showed Plaintiff the pictures on his Apple watch, which he wore while working in the facility. *Id.* ¶¶ 50-51. After she sent the pictures, on or around June 10, 2023, during the laundry workers' extra out-of-cell time, Officer Banks called Plaintiff to his office and digitally penetrated her vagina and anus, and had her touch his penis. *Id.* ¶ 53-54. Shortly after that, Officer Banks groped her in a laundry closet. *Id.* ¶ 58.

After these incidents, Plaintiff was moved to the Special Housing Unit ("SHU"), purportedly due to disciplinary incidents, which were later dismissed. *Id.* ¶¶ 62-63. Officer Banks visited her there and told her he was there "to make sure that the other 'girls' were 'straight.'" *Id.* ¶¶ 65-66. Upon information and belief, Plaintiff's SHU placement was retaliatory to keep her quiet, and Officer Banks had been sexually inappropriate with other incarcerated women in the past. *Id.* ¶¶ 64, 67, 68, 70.

## II. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Courts therefore "assume the[] veracity" of any "well-pleaded factual allegations"

and “determine whether they plausibly give rise to an entitlement to relief.” *Id.* at 679. To meet the plausibility standard, “the plaintiff must give enough details about the subject-matter of the case to present a story that holds together.” *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff must show that “the jurisdictional requirements have been met,” and courts “accept as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff.” *Ctr. for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-589 (7th Cir. 2014) (quoting *Iddir v. INS*, 301 F.3d 492, 496 (7th Cir. 2002)).

## III. ARGUMENT

### A. Plaintiff Exhausted Her Administrative Remedies.

Plaintiff timely presented her claims in writing to BOP, and included all facts necessary to allow the government the opportunity to investigate and settle her claims without litigation. The governing regulation provides that claimants “may either *mail or deliver* the claim to the regional office in the region where the loss or injury occurred.” 28 C.F.R. § 543.31(c) (emphasis added). The government confirms it received Plaintiff’s claim and supplemental submissions, with all required materials, prior to the statutory deadline. *See* Decl. of Johnna Burrows in Supp. Mot. to Dismiss (“Burrows Decl.”) ¶ 8; *see also* 28 C.F.R. § 543.32(a). Defendant cites no controlling authority holding that timely submission by email does not suffice, or that claims to BOP must be physically mailed or physically delivered. Plaintiff’s SF-95 sufficiently put the government on notice of her claims. This constitutes exhaustion.

#### 1. BOP Received Plaintiff’s Administrative Claim Within the Statute of Limitations.

Plaintiff exhausted administrative remedies because she timely submitted her SF-95 via electronic mail to the correct regional office’s electronic mail address, which is publicly posted

by the BOP, with an additional copy sent via physical mail. Defendant does not argue that this method of submission "hindered or thwarted the settlement process envisioned by the FTCA." *Smoke Shop, LLC v. United States*, 761 F.3d 779, 788 (7th Cir. 2014). Nor does Defendant show the claim was untimely: In support of the motion, Defendant presents contemporaneous evidence of the BOP's receipt of the claim. Burrows Decl. ¶ 8 & Ex. 1. Rather, Defendant argues the delivery method was insufficient under an unwritten rule without basis in the regulations or caselaw.

To proceed with an FTCA claim in federal court, a plaintiff must first have "presented [the claim] in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b); *see also* 28 U.S.C. § 2675(a) (before filing in district court, "the claimant shall have first presented the claim to the appropriate Federal agency"). Per the FTCA implementing regulation, "a claim shall be deemed to have been presented when a Federal agency *receives* from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident," along with three other requirements that are not at issue here. 28 C.F.R. § 14.2(a) (emphasis added); *see also Chronis v. United States*, 932 F.3d 544, 546-47 (7th Cir. 2019) (discussing the "presentment" requirement, including "notification of the incident").

The BOP-specific regulations for filing and processing FTCA claims state that "[t]he presentment date is the date your submission containing all required signatures and necessary information is first *received* by either the Department of Justice or an office of the Bureau of Prisons." 28 C.F.R. § 543.32(a) (emphasis added). The regulation further states, "[y]ou may either mail *or deliver* the claim to the regional office in the region where the loss or injury occurred." 28 C.F.R. § 543.31(c) (emphasis added). The regulation does not define "deliver,"

but textually it indicates that a method of service other than physical mail (*i.e.*, by electronic mail) is sufficient. Indeed, Merriam-Webster's Dictionary defines "deliver" as both "to take and hand over to or leave for another," and as "to send, provide, or make accessible to someone electronically." *Deliver*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/deliver (last visited Aug. 25, 2026). None of these documents or provisions states that only hand-delivery or physical mail is permitted, or that the publicly posted email addresses for regional offices cannot be used by the public to notify BOP of tort claims.

On May 23, 2025, Plaintiff presented her claim in writing via electronic mail and then presented a supplement on June 3, 2025, to the publicly posted electronic mail address for the South Central Regional Office, which covers FTC Oklahoma City, consistent with BOP's directions for submitting claims. *See* Compl. ¶ 16. The declaration of Johnna Burrows submitted in support of Defendant's motion confirms that Plaintiff's claim was received on both dates. Burrows Decl. ¶¶ 8, 10. This constitutes presentation of the claim. 28 C.F.R. § 14.2(a). The analysis should end here, but Defendant pushes an interpretation of the FTCA that is unsupported and unworkable.

Defendant now claims that physical mail is required in the context of their motion to dismiss, but this is not the sort of regulatory interpretation to which courts defer. *Keys v. Barnhart*, 347 F.3d 990, 993 (7th Cir. 2003) (declining to defer to an agency interpretation "found only in a brief"). Defendant concedes that BOP received Ms. Roe's administrative claim, in writing, on a date that falls within the period in which she was required to exhaust it. Burrows Decl. ¶ 8. That is enough to satisfy "the purpose of the FTCA's exhaustion requirement," which is "to facilitate the administrative evaluation of tort claims by the agency whose activity gave

rise to the claim and permit settlement of meritorious claims more quickly and without litigation." *Warrum v. United States*, 427 F.3d 1048, 1050 (7th Cir. 2005).

Regardless, under Seventh Circuit precedent, failure to comply with a technical provision of the FTCA's presentment requirement "is only fatal if it can be said to have 'hinder[ed] or 'thwarted' the settlement process 'that Congress created as a prelude to litigation.'" *Smoke Shop*, 761 F.3d at 788 (quoting *Kanar v. United States*, 118 F.3d 527, 531 (7th Cir. 1997)).[1] Even if BOP's regulations or guidance documents could be said to have sufficiently put Plaintiff on notice that email submission of an FTCA administrative claim does not suffice—which Plaintiff does not concede—Ms. Roe's timely email submission was not "fatal" because the BOP contemporaneously received her claim. *Id.* Defendant does not (and could not) contend that email delivery to an actively used inbox "hindered or thwarted the settlement process envisioned by the FTCA." *Id.* Indeed, in *Kanar*, the Seventh Circuit concluded that it is "possible to litigate under the FTCA following an administrative demand that does not comply with every jot and tittle of the rules defining a 'claim,'" and noted that it had allowed a claim to proceed where a plaintiff "sent the claim to the wrong agency." 118 F.3d at 530-31.

Defendant also relies on the maxim that "Congress is entitled to 'make [m]en … turn square corners' before haling the government into court' . . .—'[i]f [the government] attaches even purely formal conditions to its consent to be sued those conditions must be complied with.'" Mot. at 14 (internal quotation marks omitted) (quoting *Smoke Shop*, 761 F.3d at 788. Even setting aside the fact that the "square corners" at issue here were not mandated by

[1] Defendant cites *Lane v. Pena*, 518 U.S. 187, 192 (1996) for the proposition that "the FTCA's procedural rules must be 'strictly construed.'" Mot. at 10. This rule must be interpreted alongside later precedents including *Smoke Shop* and *Kanar*. Further, *Lane* is not about presentment, exhaustion generally, or the FTCA; rather, it is about strictly construing statutory waivers of sovereign immunity. *See* 518 U.S. at 191-93.

Congress, Defendant misses the essentials of *Smoke Shop*. The next sentence of the case explains, "Congress decided that it wanted agencies to have a chance to settle damages claims before facing litigation." *Smoke Shop*, 761 F.3d at 788. BOP had that chance here. Further, *Smoke Shop* is factually distinct, and its reasoning—like that of the prior Seventh Circuit cases it relies on—cuts in Ms. Roe's favor. Unlike Ms. Roe, the plaintiff in *Smoke Shop* did not put the government on notice that it sought "money damages in a sum certain," as is required under the FTCA, and "did not file a formal administrative claim . . . before filing its FTCA action." *Id.* at 787. The Seventh Circuit reasoned that plaintiff's "omission of the money-damages element" was "fatal" because it "hindered or thwarted the settlement process envisioned by the FTCA." *Id.* at 787-88. Plaintiff's email filing of her complete claim did neither.[2]

Further, the cases Defendant cites do not confirm its reading of BOP's FTCA regulations. Defendant cites *Bailey v. Schneider*, No. 20-cv-00802, 2023 WL 2631860, at *7 (S.D. Ill. Mar. 24, 2023), as requiring incarcerated plaintiffs to mail their claims. However, this unreported case cites 28 C.F.R. § 543.31(c), which does not say that mail is the only option. Moreover, the plaintiff in *Bailey* failed to exhaust because he "waited less than two months" to sue after filing his administrative claim, rather than the statutorily required six months. *Id.* at *8. Defendant's citation to *Donavan v. Bureau of Prisons*, No. 07-C-105, 2008 WL 4603337, at *2 (E.D. Wis. Oct. 16, 2008), is similarly unpersuasive. Unlike Ms. Roe, the plaintiff in *Donovan* filed only "internal BOP administrative remedies," which is a "distinct" procedure from an FTCA claim,

[2] Defendant cites *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) for the proposition that "[t]o properly exhaust remedies, 'a prisoner must file complaints and appeals *in the place, and at the time*, the prison's administrative rules require.'" Mot. at 10. But *Dole* is about Prison Litigation Reform Act exhaustion, not the FTCA. *See Dole*, 438 F.3d at 809 ("A prisoner must properly use the prison's grievance process. If he or she fails to do so, the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted.").

and the court noted that an incarcerated plaintiff "*may* file his [FTCA] claim by mailing" the claim. *Id.* at *2 (emphasis added). Like the regulations, neither case holds that FTCA claims to BOP must be physically mailed. Defendant's citation to *Bellecourt v. United States*, 994 F.2d 427, 430 (8th Cir. 1993) is also inapposite. There, the plaintiff submitted his claim to "the associate warden" at his facility, not the appropriate BOP regional office; his claim "was not received" by BOP; and he omitted the mandatory request for money damages. *Id.* In contrast, Ms. Roe submitted her claim to the appropriate regional office, which received it, and she claimed money damages.

While some courts have dismissed or affirmed dismissal of FTCA claims for failure to exhaust where the plaintiff submitted or attempted to submit their claim by email, the dismissals were not because of the electronic mail delivery method itself. For example, in *Thompson v. United States*, No. 24-1495, 2024 WL 4973309, at *2 (7th Cir. Dec. 4, 2024), the Seventh Circuit affirmed the dismissal of an incarcerated plaintiff's FTCA claim for failure to exhaust, because his exhaustion attempt lacked "the required information" and was "misdirected"—as he sent a pre-suit "email to the Department of Justice's [OIG] hotline and . . . letters to the Attorney General," rather than submitting a claim to a BOP regional office—and he only "communicated with" BOP "after he sued the government." Similarly, in *Puetz v. United States*, No. 23-2710, 2024 WL 1739442, at *2 (8th Cir. Apr. 23, 2024), the Eighth Circuit affirmed dismissal of plaintiff's emailed FTCA claim not because of the submission method, but because plaintiff's counsel did not comply with the requirement to present evidence of his authority to bring the claim. *See also, e.g.*, *Manchanda v. Lewis*, No. 21-1088-CV, 2021 WL 5986877, at *4 (2d Cir. Dec. 17, 2021) (where plaintiffs emailed their FTCA claim, alleging injuries by U.S. Citizenship and Immigration Services officers, to "a number of agencies and individuals," dismissal was

warranted for various reasons not including the use of email). In contrast to each of these cases, Plaintiff timely emailed the correct regional office all required materials.

### 2. Plaintiff's Administrative Claim Sufficiently Put BOP on Notice.

Defendant contends that Plaintiff failed to exhaust administrative remedies because she did not notify BOP of every single fact discussed in the Complaint. Mot. at 15-16. But to satisfy the administrative exhaustion requirement, "a claimant is not required to submit evidence or to include every detail that might be necessary to prove at trial." *Delgado v. Merit Sys. Prot. Bd.*, 880 F.3d 913, 925 (7th Cir. 2018), *as amended* (June 19, 2018). The claimant must "set forth the relevant facts in enough detail to alert the Bureau of Prisons to the presence of" her claims, and has done enough "if the claim[s] would have been apparent to a 'legally sophisticated reader.'" *Palay v. United States*, 349 F.3d 418, 425-26 (7th Cir. 2003); *see also Khan v. United States*, 808 F.3d 1169, 1172-73 (7th Cir. 2015) ("All that must be specified . . . is 'facts plus a demand for money'; if those two things are specified, 'the claim encompasses any cause of action fairly implicit in the facts.'" (quoting *Murrey v. United States,* 73 F.3d 1448, 1452 (7th Cir. 1996))).

Defendant asserts that Plaintiff failed to exhaust because she did not allege in her SF-95 that Officer Banks provided her with his email address and that her family member emailed with him, or that her SHU placement at FTC Oklahoma City was retaliatory. Mot. at 15-16. But Defendant does not argue that the absence of these details prevented the BOP from determining that Plaintiff sought to assert any of the claims she later brought in her Complaint. *See id.*; *see also Delgado*, 880 F.3d at 925; *Khan*, 808 F.3d at 1172-73.

Defendant additionally argues that Plaintiff failed to exhaust allegations relating to events that occurred after her transfer from FTC Oklahoma City, such as those involving Officer Brant, and that these events also postdate when her claim accrued. Mot. at 16. Plaintiff does bring any causes of action based on conduct by Officer Brant and Plaintiff does not dispute when her claim

accrued. Instead, Plaintiff included these facts as relevant to the ongoing impact of the assault and what led to Plaintiff's initial interview with BOP's Special Investigative Services (SIS) and her reporting to BOP of what happened at FTC Oklahoma City. Compl. ¶¶ 81-84.

### B. Plaintiff Sufficiently Alleged that Officer Banks Was Acting Within the Scope of His Employment; Regardless, Scope of Employment Is a Fact-Bound Determination Unsuitable for Resolution on a Motion to Dismiss.

To make out an FTCA claim, a plaintiff must allege sufficient facts to show that her injuries were caused by a federal employee acting within the scope of his employment. *See Brownback*, 592 U.S. at 212.[3] As Defendant states, Oklahoma's law of respondeat superior provides the contours for whether Officer Banks acted within the scope of his employment. Mot. at 17.

Defendant contends that the United States cannot be held liable for Officer Banks' abuse of Ms. Roe at FTC Oklahoma City because (1) his actions were prohibited; (2) Oklahoma's respondeat superior law leaves no avenue to hold an employer liable for an employee's sexual assault; and (3) Officer Banks' tortious conduct could not possibly have been incidental to his job responsibilities and his motivations could not have been in any way job-related. No part of this theory holds up under scrutiny at the pleading stage. Moreover, in an FTCA case based on sexual assault of an incarcerated person by a BOP officer, the United States conceded that the officer was acting within the scope of his employment. *Millbrook v. United States*, 569 U.S. 50, 55 n.3 (2013). Here, Plaintiff's allegations support the inference that Officer Banks acted within the scope of his employment, and Oklahoma law is clear that this is a question for the fact-finder.

[3] Defendant does not dispute that the FTCA's law enforcement proviso, 28 U.S.C. § 2680(h), applies here. *See Millbrook v. United States*, 569 U.S. 50, 52-53 (2013) (explaining that "Congress carved out an exception to § 2680(h)'s preservation of . . . sovereign immunity for intentional torts by adding a proviso covering claims that arise out of the wrongful conduct of law enforcement officers . . . including assault and battery").

### 1. Oklahoma Law Recognizes that the Scope of Employment of a Law Enforcement Officer or a Private Person Is a Fact-Bound Determination Unsuitable for a Motion to Dismiss.

Courts applying Oklahoma law have used two overlapping frameworks to analyze scope of employment, including in FTCA cases based on a law enforcement official's tortious conduct. Both require close analysis of the nature of the employee's authorities and responsibilities. In general, under Oklahoma law, "[a]n employer may be held responsible for the tort committed by the employee where the act is incidental to and done in furtherance of the business of the employer even though the servant or agent acted in excess of the authority or willfully or maliciously committed the wrongs." *Baker v. Saint Francis Hosp.*, 126 P.3d 602, 605 (Okla. 2005). The employer may be liable for the employee's intentional tort "even though the act . . . was against the express orders of the company." *Id.* at 605 (quoting *Chi., R.I. & P. Ry. Co. v. Radford*, 129 P. 834, 837 (Okla. 1913)).

A second framework takes into consideration the motivations and duties specific to law enforcement officers. In applying "the scope-of-employment analysis in the context of law enforcement, the Oklahoma Supreme Court has embraced a test" under which respondeat superior "liability exists for acts of officers that can be described as abuses of lawful power." *Barnes v. United States*, 707 F. App'x 512, 517 (10th Cir. 2017) (quoting *DeCorte v. Robinson*, 969 P.2d 358, 361-62 (Okla. 1998)) (distinguishing such acts from "an unlawful usurpation of power the officer did not rightfully possess," and proceeding to apply both the generally applicable and law-enforcement-specific tests in FTCA case). Thus, "[a]n 'officer's misconduct, though illegal,' may be 'accomplished through a[n] abuse of power lawfully vested in the officer.'" *Id.* (quoting *DeCorte*, 969 P.2d at 362). The assessment of a law enforcement officer's motivations is broad, "perhaps because public-policy concerns generally make it 'appropriate to hold [the law-enforcement agency] responsible for [an officer's] acts,'" such that

"an officer may have in mind a governmental purpose when he abuses a prisoner; uses excessive force in an arrest; assaults nightclub patrons; or even arrests a child for the purpose of sexually abusing her." *Barnes*, 707 F. App'x at 519 (internal citations omitted) (quoting *Baker*, 126 P.3d at 607) (collecting cases).

Under either framework, "[t]he question of whether or not a servant should be considered to have been acting within the line of duty sufficient to support *respondeat superior* liability is normally a question of fact to be determined by the [fact-finder] from all the surrounding circumstances," including the employee's "motivation and purpose" for acting. *Baker*, 126 P.3d at 605-06; *see also Barnes*, 707 F. App'x at 519 (citing *Baker*, 126 P.3d at 607).

One of Defendant's core arguments misconstrues Oklahoma law under either framework. If accepted, Defendant's claim would effectively immunize the United States from any liability for on-the-job sexual assault by its employees. Defendant misconstrues Oklahoma law by contending that it could not possibly be liable for Officer Banks' sexual assault of Ms. Roe because his actions were prohibited and not of the type he was hired to perform. *See* Mot. at 22-24. The fact that BOP policy and governing statutes prohibit sexual abuse of incarcerated people by officers does not relieve the United States of liability. *See Baker*, 126 P.3d at 606 (respondeat superior liability available even if an act "was against the express orders of the company"); *Barnes*, 707 F. App'x at 519 ("An 'officer's misconduct, though illegal,' may be 'accomplished through a[n] abuse of power lawfully vested in the officer,'" such as submitting perjured testimony (quoting *DeCorte*, 969 P.2d at 362)). Further, Oklahoma law also does not always prevent respondeat superior liability for an employee's sexual assault as a matter of law. *See Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 161 (Okla. 2008). While the Oklahoma Supreme Court has rejected respondeat superior liability in two cases about sexual abuse by a

minister and a priest against parishioners, it specified that these cases do not set a bright-line rule and were fact-and-ecclesiastical-organization-specific. *Id.* (clarifying that prior case's characterization of "sexual predatory conduct as outside the scope of employment as a matter of law" was specific to the context of the "ecclesiastical organization" at issue) (citing *N.H. v. Presbyterian Church (U.S.A.)*, 998 P.2d 592, 599 (Okla. 1999))); *see also Green v. Bd. of Cnty. Comm'rs*, No. 17-CV-577, 2018 WL 4956113, at *7-8 (N.D. Okla. Oct. 12, 2018) (denying motion to dismiss respondeat superior claim based on jail officer's sexual abuse of plaintiff).

Ms. Roe's Complaint survives the motion to dismiss under either framework outlined here. Defendant argues that the Court may determine the scope of employment question in the negative as a matter of law because "only one reasonable conclusion can be drawn." *Carswell v. Okla. State Univ.*, 995 P.2d 1118, 1123 (Okla. 1999). On the contrary, the Court may not make such a determination here. At minimum, Plaintiff's allegations create the inference that Officer Banks' abusive conduct was part and parcel of his work as laundry supervisor and unit officer, while he was engaged in his core responsibilities of recruiting and supervising laundry workers and maintaining control over women in the unit, even though he abused his authority and some of these acts were against policy or law. *See Barnes*, 707 F. App'x at 517; *Baker*, 126 P.3d at 606; *cf. Ctr. for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 589 (7th Cir. 2014) (on motion to dismiss, courts "accept as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff").

### 2. Officer Banks Acted Within the Scope of His Employment Because His Tortious Conduct Was Accomplished Through Abuse of Power Lawfully Vested in a BOP Officer and Was Incidental to His Work Responsibilities.

#### (a) Under Oklahoma Law, Officer Banks Acted Within the Scope of His Employment as a Law Enforcement Officer.

Taking the law enforcement-specific test first: Officer Banks' actions as alleged in the Complaint were "accomplished through a[n] abuse of power lawfully vested in [him]" by his role as laundry supervisor and unit officer. *Barnes*, 707 F. App'x at 517 (quoting *DeCorte*, 969 P.2d at 362). Plaintiff's allegations show that Officer Banks' acts that harmed her "were performed in the normal course of his duties" of supervising laundry workers and the women in the unit during late-night out-of-cell time that he granted for laundry workers. *Id.* at 518. Plaintiff's allegations also support the inference that Officer Banks was able to offer the privileges of out-of-cell time, snacks, and gifts, because of the authority Defendant vested in him.

As detailed in the Statement of Facts, Plaintiff alleged the following: Officer Banks' role gave him "total control over hiring and firing of" laundry workers, and "authority to remove people from the job if they d[id] not follow [his] instructions." Compl. ¶ 36. Officer Banks recruited Plaintiff to work in the laundry department. *Id.* ¶¶ 40-41. Characterizing his approach to his work as laundry supervisor, Officer Banks told Ms. Roe that he "takes care of" his workers and gives them special privileges. *Id.* ¶ 43. Officer Banks' actions show that he carried out his responsibilities by building trust and loyalty through providing these privileges, *id.* ¶ 44, and by giving one-on-one attention to incarcerated people including Plaintiff and giving the impression that he cared about them personally, *id.* ¶¶ 45, 67-70. Officer Banks did not only do this with Plaintiff. *See id.* ¶¶ 44, 67-68, 70, 74.

While supervising extra evening out-of-cell time for laundry workers, on or about June 1, 2023, he directed Ms. Roe to come to his office. *Id.* ¶ 53. With the office door open—but angled

to block the cameras—Officer Banks assaulted and battered Ms. Roe. *Id.* ¶¶ 53-54. Throughout the encounter, he told her what to do and she complied. *Id.* ¶ 54-55. Officer Banks then told her to take snacks she could not purchase on commissary, continuing his practice of providing special privileges to workers, and she did so. *Id.* ¶ 55. A day or two later, Officer Banks followed Ms. Roe into the laundry closet while she was working and assaulted her. *Id.*¶ 58.

In *Barnes*, the Tenth Circuit concluded that though an ATF agent who falsified evidence and provided perjured testimony which harmed the plaintiff acted "despicably," he nevertheless "was acting within the customary scope of his duties" of "preparing for trial and testifying." *Barnes*, 707 F. App'x at 518. The court relied on Oklahoma Supreme Court cases on the general law of respondeat superior, the law enforcement context, and Florida law that the Oklahoma Supreme Court had in turn relied upon. *See id.* at 517-18 (discussing *DeCorte* and *McGhee v. Volusia County*, 679 So. 2d 729, 732-33 (Fla. 1996)). The Tenth Circuit rejected the government's arguments that the agent was "acting outside the scope of his authority because" he was not "authorized to frame a person known to be innocent," reasoning that "an officer is also not authorized to use excessive force or commit sexual assault"—acts which courts have found fall within the scope of employment. *Id.* at 518 (citing cases under analogous Oklahoma and Florida law). Here, too, even though Officer Banks was not "authorized to . . . commit sexual assault," when he did so he was "acting within scope of his duties" of supervising laundry workers and all women on his assigned unit. *Id.* Defendant's argument to the contrary is without merit. Mot. at 22-25. Plaintiff's allegations show that Officer Banks' sexually abusive behavior toward Ms. Roe was always connected with his tasks, not simply that the abuse happened to occur at work, or that he strayed far outside his duties in pursuing Plaintiff.

The principles upon which Oklahoma law relies also undercut Defendant's scope of employment argument. As explained by the Tenth Circuit, the Oklahoma Supreme Court in *DeCorte*—which Defendant cites, Mot. at 20—applied a framework elaborated by the Florida Supreme Court. *See Barnes*, 707 F. App'x at 517. Applying Florida law in an FTCA case based on a BOP officer's sexual abuse of an incarcerated woman, a federal court denied the United States' motion to dismiss, reasoning that the officer "was assisted in accomplishing the tort by virtue of the employer/employee relationship." *Simon v. United States*, No. 22CV321, 2023 WL 11937176, at *5 (N.D. Fla. May 3, 2023) (citing cases involving sexual assault by law enforcement officers). The court found it was plausible that the officer's "conduct was directly aided by virtue of his employment with the BOP," based on the plaintiff's allegations that the officer "sexually assaulted her while he was on duty as a prison guard and while she was in custody," and "threatened her with retaliation and the loss of certain prison privileges and freedoms if she did not give in." *Id.* at *8. Here, too, Officer Banks sexually assaulted Ms. Roe "while he was on duty as a prison guard," he had the power to revoke the privileges he granted her, and thus his "conduct was directly aided by virtue of his employment with BOP." *Id.* at *8; Compl. ¶¶ 36, 40-44, 53-54, 58.[4] Ms. Roe also alleged that soon after the assaults she was put in restrictive housing, where Officer Banks came to see her and made statements that raise an inference that the placement was pretextual and intended to ensure her silence. Compl. ¶¶ 65-66.

[4] Decisions applying other states' laws in FTCA claims based on sexual assault by law enforcement officers follow a similar analysis. *See, e.g.*, *L.B. v. United States*, 515 P.3d 818, 824-25 (Mont. 2022) (concluding that officer's sexual abuse "was not so disconnected from his employment," which permits "initiating nonconsensual, and at times invasive, physical contact . . . pursuant to law enforcement goals"); *Red Elk ex rel. Red Elk v. United States*, 62 F.3d 1102, 1107 (8th Cir. 1995) (applying South Dakota law, holding that the officer acted within the scope of employment when sexually assaulting a person in custody where he "had that opportunity because of his employment, the trappings of his office, and the [] policy he was to enforce").

Plaintiff alleged sufficient facts to support the inference that Officer Banks was at least partially motivated by "a governmental purpose" such as asserting and maintaining order in the laundry department and unit, including by cultivating loyal workers. *Barnes*, 707 F. App'x at 519 ("[A]n officer may have in mind a governmental purpose when he abuses a prisoner . . . or even arrests a child for the purpose of sexually abusing her." (citations omitted)); *see also Simon*, 2023 WL 11937176, at *8 ("[T]he question of whether [the officer] acted within the scope of his employment when he sexually assaulted Plaintiff is a fact-intensive one that cannot be resolved on a motion to dismiss . . . .").

**(b) Under Oklahoma Law Applicable to Private Persons, Officer Banks Acted Within the Scope of His Employment.**

Defendant does not distinguish Ms. Roe's case from those applying a law-enforcement-specific analysis. Even if the Court were to rely exclusively on Oklahoma's general rules for respondeat superior, Ms. Roe alleged enough. The cases consider the nature of the employment, which includes assessment of the "character and degree" of the authority conferred upon the employee—such as whether it included "authority contemplating extraordinary action" like use of force—such that the employee's tortious conduct "was to be anticipated by the employer." *Tulsa Gen. Drivers, Warehousemen, & Helpers Union, Loc. No. 523 v. Conley*, 288 P.2d 750, 753 (Okla. 1955); *see also Baker*, 126 P.3d at 606 (collecting cases on whether the employer "could have anticipated the wrongful acts taken"). Again, respondeat superior liability may be available even if the act was prohibited, and respondeat superior liability "is not prevented by the fact that the servant acts in part because of a personal motive, such as revenge." *Baker*, 126 P.3d at 606-07 (quoting Restatement (Second) of Agency § 245 cmt. f). In the ecclesiastical context, the Oklahoma Supreme Court has indicated that an employer may be liable for "predatory sexual conduct," although the employer has "condemned" such conduct, if the plaintiff alleges

sufficient facts to permit the inference that an employee "utilized predatory sexual conduct as a means of advancing the [entity's] business," and that the "condemnation" is a "denominational sham." *Schovanec*, 188 P.3d at 161; *see id.* (exclusively citing an ecclesiastical case in its respondeat superior analysis). Outside of the ecclesiastical context, when considering assaults by employees, courts analyze the employee's possible mixed motivations and the foreseeability of the act, as illustrated by *Baker* and *Tulsa Gen. Drivers*.

Officer Banks' assault and battery of Plaintiff were incidental to his work responsibilities, such that BOP "could have anticipated the wrongful acts taken." *Baker*, 126 P.3d at 606. These acts took place during his work hours, in an office reserved for correctional officers and in a closet used by the laundry department supervisor and workers, while he was carrying out his responsibilities of supervising Plaintiff and other incarcerated people as workers in the laundry department during extra out-of-cell time he granted and during normal laundry hours. Compl. ¶¶ 36, 40-42, 53-55, 58; *see Baker*, 126 P.3d at 605. Plaintiff's allegations support the reasonable inference that BOP gave Officer Banks the authority to offer special privileges to facilitate running the laundry department and controlling incarcerated individuals on the unit.

Regulations further define the "character and degree" of Officer Banks' authority, which included "authority contemplating" use of force and invasive physical contact to carry out the employer's purposes. *Tulsa Gen. Drivers*, 288 P.2d at 753 (union employee serving as a "peaceable picket[er]" left the scope of his employment by leaving the picket to beat someone); *see also Baker*, 126 P.3d at 606 (discussing past case where a toll-bridge worker was within the scope of his employment when he "shot an automobile driver when he drove past the toll gate and failed to pay the toll," in the course of his "duty to obtain payment of the toll" (citing *Ada-Konawa Bridge Co. v. Cargo*, 21 P.2d 1 (Okla. 1932))). BOP staff are authorized to use force

under certain circumstances, including for purposes of "gain[ing] control of the inmate" and "to ensure institution security and good order." 28 C.F.R. § 552.20; *see also id.* § 552.11 (authority to conduct searches of incarcerated people). To Plaintiff, Officer Banks described his approach to his work as "tak[ing] care" of his laundry workers. Compl. ¶ 43; *see also id.* ¶ 30 (Officer Banks and Defendant owe a duty of "safekeeping, care . . . [and] protection," under 18 U.S.C. § 4042(a)(2)-(3)). He additionally used the authority and knowledge that came with his position as a correctional officer to coerce Ms. Roe to enter into what she believed to be a romantic attachment, to spend time alone with her, and to direct her to his office away from security cameras where he then assaulted her. *See Baker*, 126 P.3d at 607 n.5 (concluding that it was a jury question whether the acts of caregiver who intentionally hit an infant's head against a shelf "could have been foreseen, anticipated or were not unexpectable by [employer]").

Officer Banks' supervision responsibilities were also broad by design, which gave him significant power over every aspect of Ms. Roe's life. *Cf. J.K.J. v. Polk County*, 960 F.3d 367, 381-82 (7th Cir. 2020) (en banc) (in Eighth Amendment case, recognizing that the plaintiffs whom guards sexually abused "were confined in circumstances where they depended on male guards for nearly everything in their lives—their safety as well as their access to food," and that "[w]ith this authority and control for the guards came power and, in turn, access and opportunity to abuse it"); *Primeaux v. United States*, 102 F.3d 1458, 1463 (8th Cir. 1996) (in FTCA case, explaining that a federal officer, even off duty, "possesses the apparent authority sufficient to cause a person to rely on or fear that authority and succumb to sexual advances" and sexual assault was thus "foreseeable because of the unique position of trust held by such officers"); *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1352 (Cal. 1991) (finding that a police officer's

sexual assault was within the scope of employment because he took "advantage of his authority and control as a law enforcement officer").

Defendant points to several inapposite cases to support the argument that Officer Banks acted outside the scope of his employment. For example, cases rejecting respondeat superior liability where the employee had narrow duties and no authority analogous to those in caretaking or security contexts like Officer Banks' roles are unpersuasive. *See* Mot. at 20-21.[5] Likewise, cases where the torts occurred away from the job site or otherwise involved spatial separation from the employer's place of business are inapposite, given the custodial setting here and the fact that all acts occurred in the housing unit and laundry department. *See* Mot. at 20-21.[6]

Oklahoma courts conduct a fact-intensive analysis of the employee's motivations, including in cases Defendant cites involving employees tasked with care of vulnerable individuals. Courts do not measure motivations or conduct against the employer's rules for what should arise while carrying out job responsibilities, or against abstract notions of proper conduct or a typical employee's motivations. *See Baker*, 126 P.3d at 605-07. Where the allegations lead

---

[5] *See, e.g.*, *Hill v. McQueen*, 230 P.2d 483, 486 (Okla. 1951) (debt collector's assault of a customer was outside the scope of his employment because he only had the duties of collecting and inquiring about debt, no broader authority); *Allison v. Gilmore, Gardner & Kirk, Inc.*, 350 P.2d 287, 293 (Okla. 1960) (no liability for employee's assault where "there was nothing connected with the employment of the truck driver . . . whose duties were to drive the truck . . . and deliver gasoline, that would warrant his fighting with plaintiff").

[6] *See, e.g.*, *Hyatt v. Bd. of Regents of Okla. Colls.*, No. CIV-13-0750, 2015 WL 521112, *4 (W.D. Okla. Feb. 9, 2015) (where a security officer coerced plaintiff into a sexual relationship and took plaintiff offsite and Complaint alleged no "facts from which to conclude" that officer's actions served a security purpose); *Warren v. U.S. Specialty Sports Ass'n*, 138 P.3d 580, 587 (Okla. Civ. Ct. App. 2006) (plaintiffs did not allege that employee's assault occurred while the employee was engaged in employer's business, the evidence showed the assault occurred at a third location, and there was no evidence his work would provoke a natural impulse to assault a patron); *Okla. Ry. Co. v. Sandford*, 258 P.2d 604, 607 (Okla. 1953) (employer not liable for bus driver's assault on plaintiff where driver "left his bus" to confront the plaintiff away from a bus stop, "at a place in which [the driver], under his employment, was not required to stop").

to two possible conclusions, the question must go to the fact-finder. That Officer Banks may have acted "in part because of a personal motive" does not mean he did not also have the "intent to act on his [employer's] behalf." *Id.* at 607 (quoting Restatement (Second) of Agency § 245 cmt. f). Plaintiff's allegations show that Officer Banks' sexually predatory behavior toward Ms. Roe was always connected with his tasks, as explained *supra*. *Id.*; Mot at 24. Resolution at the motion to dismiss stage would be improper.

An employee's tortious act may be within the scope of employment if it was done "from some impulse of emotion which naturally grew out of or was incident to the attempt to perform the master's business," or "arises out of an emotional response to actions being taken for the employer." *Baker*, 126 P.3d at 605 (quoting *Rodebush ex rel. Rodebush v. Okla. Nursing Homes, Ltd.*, 867 P.2d 1241, 1245 (Okla. 1993)). For example, in *Baker*, it was a question for the fact-finder why a daycare employee intentionally hit an infant's head against a shelf. 126 P.3d at 607. The Oklahoma Supreme Court found the employer's argument "mischaracterize[d] the law" by claiming that "[i]t is self-evident that the act of smashing a child's head against a shelf does not accomplish the assigned work of caring for, protecting, and nurturing." *Id.* at 605. Rather, this work could have caused "some type of stress-induced temporary loss of control over one's behavior," so the employee's acts could have involved "an emotional response to actions taken for the employer" if she was attempting to quiet the infant. *Id.*; *see also id.* at 607 n.5; *Rodebush*, 867 P.2d at 1246 (finding nurse's aide, who slapped a "combative" Alzheimer's patient while bathing the patient, was acting within the scope of his employment because the aide "was carrying out an assigned task when the slapping occurred"). Here, it is plausible that Officer Banks' actions arose "out of an emotional response to actions being taken for the employer," as supported by Plaintiff's allegations that in the course of his duties recruiting and

supervising laundry workers and the women on the unit, prior to the assaults, Officer Banks paid her one-on-one attention, telling her about his personal life, flirting with her, and giving her gifts. *Baker*, 126 P.3d at 605; Compl. ¶¶ 41-48. Through this approach to his work, Officer Banks secured Ms. Roe's willingness to do what he said—first joining the laundry department, and later coming to his office at night when he summoned her—and her loyalty and fear of repercussions even after she left FTC Oklahoma City. *See Baker*, 126 P.3d at 605, 607 n.5.

In this context, it is also plausible that Officer Banks "utilized predatory sexual conduct as a means of advancing the [BOP's] business," *Schovanec*, 188 P.3d at 161, meaning that he was motivated at least in part "to act on his [employer's] behalf," *Baker*, 126 P.3d at 607 (quoting Restatement (Second) of Agency § 245 cmt. f); *cf. L.B. v. United States*, 515 P.3d 818, 825-26 (Mont. 2022) (under Montana law, fact-finder in FTCA case could find officer who "abused his employer-conferred power and authority to sexually assault [plaintiff]" while investigating a DUI was motivated in part "to investigate the interests of his employer," and noting, "when an officer intimidates a civilian through . . . use-of-force or the threat of force, he provides a benefit to his employer by maintaining law and order in the community"). Defendant argues that, like in two cases in the ecclesiastical context, *Schovanec* and *N.H. v. Presbyterian Church*, the Court must find that "no reasonable person would conclude that predatory sexual conduct was part of, and in furtherance of," the BOP's mission. Mot. at 21 (quoting *Schovanec*, 188 P.3d at 161). But, as the Oklahoma Supreme Court clarified, both cases, which were at summary judgment, were fact-specific and ecclesiastical-organization-specific. *Schovanec*, 188 P.3d at 161. Defendant contends that the *N.H.* and *Schovanec* courts' holdings about employee motivations apply with equal force "in the corrections context," but its case comparisons fall short. Mot. at 22. In *Koch v. Juber*, No. 13-CV-0750, 2014 WL 2171753 (W.D. Okla. May 23,

2014), the district court found the Department of Corrections was not liable for prison guards' sexual assaults of plaintiff because they were "deviating from their assigned tasks" and were not furthering any institutional goal, but rather sought "personal gratification." *Id.* at *4-5. But, unlike here, *Koch* does not analyze or explain what the guards' tasks were, in what context the assaults occurred, or whether plaintiff alleged any facts about institutional failures to enforce anti-sexual-abuse policies. Similarly, in *Gray v. Acadia Healthcare Co., Inc.*, No. 19-CV-00338, 2020 WL 5996418 (E.D. Okla. Oct. 9, 2020), where staff at a "psychiatric hospital/residential treatment center" raped plaintiff in a laundry room and a TV room, the court indicated there were no allegations that the assault took place in the course of staff completing treatment or caregiving duties or in an attempt to fulfill those duties. *Id.* at *1, *5.

Further, Plaintiff alleged facts sufficient to show that the BOP's anti-sexual-abuse practices were hollow and to create an inference of mixed motives on Officer Banks' part. In *Schovanec*, the court affirmed summary judgment for the Archdiocese on respondeat superior both because plaintiff could not show that the priest who sexually abused parishioners was seeking to "advanc[e] the denomination's business," and he "point[ed] to no fact indicating that" the denomination's condemnation of predatory conduct "is a denominational sham." 188 P.3d at 161. Here, in contrast, Plaintiff alleged that "sexual assault[] and harassment of female incarcerated people by BOP staff have been serious, systemic problems in BOP facilities for decades," which BOP had notice of prior to Officer Banks's actions in June 2023. Compl. ¶ 17.[7]

---

[7] As noted *supra*, Defendant goes too far in contending that "Oklahoma law is clear" that sexual assault is outside the scope of employment and so no Oklahoma court would hold the United States liable for Officer Banks' actions. *See* Mot. at 21. Defendant relies on *Smith v. Hedgecock*, No. 18-CV-046, 2018 WL 3478893, at *4 (E.D. Okla. July 19, 2018), which in turn relied exclusively on *N.H. v. Presbyterian Church (U.S.A.)*, 998 P.2d 592, 589-600 (Okla. 1999) and *Schovanec*. Mot. at 21. Plaintiff's allegations about the BOP's failures to address pervasive sexual abuse by officers refute Defendant's comparison of BOP's mission and its

To support this allegation, Plaintiff additionally cited a Senate subcommittee investigation's finding that between 2012 and 2022, "BOP employees sexually abused female prisoners in at least two-thirds . . . of federal prisons that have held women." *Id.* ¶ 18. Plaintiff further alleged that a DOJ working group found "long-standing, pervasive problems throughout the BOP" related to "monitoring and deterring employee sexual misconduct," and blind spots in women's prisons like the one Officer Banks took advantage of in the office. *Id.* ¶¶ 19-21. Additionally, Plaintiff cited a DOJ Office of Inspector General report's finding that flaws in BOP's investigations and accountability systems "likely embolden[] miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences." *Id.* ¶¶ 22-25. Much of Officer Banks' inappropriate conduct was out in the open, and Ms. Roe learned that he had sexually abused other women as well. *Id.* ¶¶ 51, 65-70, 74. Though statutes and BOP policies prohibit officer sexual abuse, *id.* ¶¶ 28-35, Plaintiff's allegations are sufficient to create the inference that in practice, these "condemnation[s]" of "predatory sexual conduct" are a "sham." *Schovanec*, 188 P.3d at 161.

Contrary to Defendant's argument, the "surrounding circumstances" of Officer Banks' acts do not conclusively show that he had "no intent to act on his [employer's] behalf." *Baker*, 126 P.3d at 606-07 (quoting Restatement (Second) of Agency § 245 cmt. f). As discussed herein and as alleged in the complaint, Officer Banks' job responsibilities were broad and gave him a significant amount of authority over and time alone with Ms. Roe, including in an office out of

---

stance on sexual abuse and the ecclesiastical organizations in *N.H.* and *Schovanec* (where the courts also had a full record). *See* Mot. at 24-25. Further, the *Smith* plaintiff's respondeat superior claim was subject to the state statutory definition of scope of employment that incorporates a "good faith" requirement, 2018 WL 3478893, at *4. That definition does not apply here. *See Baker*, 126 P.3d at 605; *United States v. Muniz*, 374 U.S. 150, 159 (1963) (declining to apply "restrictive rules of state immunity" to "limit suits by federal prisoners").

view of surveillance cameras. Compl. ¶¶ 36-64. Officer Banks took a personal interest in his work, professing to "take care" of his workers, and appearing to become emotionally close with Ms. Roe, which secured her willingness to do as he directed her. *See, e.g.*, *L.B.*, 515 P.3d at 826 (reasoning that "reasonable minds could differ" because "it is no more speculative to suggest that" federal officer "acted, in part, to further the [agency's] interests than it is to presume that he acted 'for his own personal gratification,'" where the record did not conclusively show that he acted "solely" for that purpose).

**C. Plaintiff Sufficiently Alleged Negligent Hiring and Supervision.**

To state a claim for negligent hiring, supervision, or retention a plaintiff must allege that "the employer had reason to believe that the person would create an undue risk of harm to others," of the sort that caused plaintiff's injuries. *N.H. v. Presbyterian Church (U.S.A.)*, 998 P.2d 592, 600 (Okla. 1999). Plaintiff may meet this requirement by alleging the employer had "prior knowledge of the servant's propensities to create" that risk. *Id.* The employer's knowledge or notice of the risk is a question of fact. *Schovanec*, 188 P.3d at 171-73. The plaintiff may show the employer's knowledge where "[a] reasonable person may infer that a fact exists from a fact that person already knows," *i.e.*, the employer had "reason to know," or where "[a] duty may require a reasonable person to ascertain whether a fact exists because of the performance of that duty," *i.e.*, the employer "should know." *Id.* at 170 (citing Restatement (Second) of Torts § 12 (1977)). "[T]he notice-producing act of the employee" need not be "exactly identical to the harm-producing act of the employee." *Id.* at 168 ("[T]here is . . . no 'one liability-free sexual abuse act' for employers supervising employees in Oklahoma when liability is denied because the notice-producing act of the employee is not exactly identical to the harm-producing act of the employee.").

Plaintiff alleged that Defendant "knew or should have known that Officer Banks was sexually inappropriate with incarcerated women and had been in the past, including based on reports from other women and actions by Officer Banks that were observable by others." Compl. ¶ 149; *see also id.* ¶ 70. Defendant concedes that "some of Banks' milder behavior—like showing her favor and talking about messages from family members—occurred in the open and where others could observe." Mot. at 26. But Defendant argues that Plaintiff's other allegations are based solely on her "belief that prison officers have a general proclivity toward sexually abusing inmates," and that the Complaint provides no factual support for "the notion that BOP officials had reason to know that Banks himself may sexually abuse inmates before June 2023." *Id.* at 25-26. To the contrary, Plaintiff's allegations "creat[e] an inference that [BOP] had reason to know" or should have known that Officer Banks would act in a sexually predatory manner toward her based on his pattern of behavior. *Schovanec*, 188 P.3d at 172. And Defendant does not claim that Officer Banks did not act as alleged or was not captured on camera.

The BOP should have been aware of Banks' conduct because there were surveillance cameras in the unit where Officer Banks served as laundry department supervisor and unit officer. Compl. ¶ 51. In the days leading up to the assault and battery in the office and laundry closet, footage monitored by employees tasked by BOP with review therefore showed Officer Banks flirting with Plaintiff and shouting to her across the unit, *id.* ¶ 45, bringing her snacks, *id.* ¶ 44, lingering to watch while she was in the shower, *id.* ¶ 47, and speaking to her one-on-one, while showing her pictures on his Apple watch, *id.* ¶ 50.

Beyond the observable and recorded conduct in the facility, the BOP also monitored Plaintiffs' incoming and outgoing communications. The content of the conversation where

Plaintiff communicated Officer Banks' email address and the request to send photographs—whether over email or phone—was also observable to BOP, as all emails and phone calls by incarcerated people are monitored by BOP.[8] When she gave her family member Officer Banks' personal email address, so that her family member could send Officer Banks the photos of Plaintiff that he requested, including one where Plaintiff was topless, Defendant should have been on notice of Banks' inappropriate behavior and done something about it. *Id.* ¶ 50, 52.

Plaintiff's allegations also show that BOP had reason to know that the assault and battery in the office and laundry closet were happening based on the observable behavior that preceded them, and the surveillance footage showing the moments before and after. Footage, which should have been preserved following Plaintiff's initial report, will likely show that, at night when the unit was largely deserted, Officer Banks called Plaintiff into the officer's station and that she then closed the door precisely in a way that blocked the cameras, and then showed Plaintiff leaving in a hurry. *Id.* ¶ 53-55. Footage will also show Officer Banks following Plaintiff into a closet. *Id.* ¶ 58. Finally, footage should show similar interactions between Officer Banks and the other incarcerated women he assaulted and showed favor to around the same time. *Id.* ¶ 47, 67-68, 74. Officer Banks' behavior with Plaintiff escalated, and Plaintiff's allegations create the inference that his behavior with the others likely did as well and followed the same timeline, as Plaintiff learned just days after her own assaults that Officer Banks had sexually assaulted another woman. *Id.* ¶ 67-68. The fact- and evidence-intensive question of BOP's knowledge is for the fact-finder and cannot be resolved on the allegations alone. *See*

---

[8] *See* Federal Bureau of Prisons, "Community Ties," https://www.bop.gov/inmates/communications.jsp ("A notice is posted next to each telephone advising inmates that calls are monitored," and "Inmates and their contacts must consent to monitoring prior to using the [email] system.") (last visited Aug. 25, 2026).

*Schovanec*, 188 P.3d at 172-73 (denying summary judgment to defendant where factual disputes remained as to defendant's notice and knowledge of priest's sexual abuse of minors).

All of these observable actions that preceded the assault and battery constitute a series of violations of BOP policy that Defendant's Motion excerpts and describes as "making it crystal clear that staff are strictly prohibited from engaging in any sexual contact with inmates." Mot. at 22-23 (citing and then quoting U.S. Department of Justice, Federal Bureau of Prisons Program Statement 3420.14, *Standards of Employee Conduct*, 7-8). Together, they also constitute notice to BOP that Officer Banks had the tendency to cultivate inappropriate intimacy with the incarcerated people he supervised, and was specifically doing so toward Ms. Roe. Plaintiff further alleged that upon information and belief Officer Banks had sexually abused others prior to Ms. Roe. Complaint ¶ 70. The law does not require that the employee's "notice-producing act" be "exactly identical to the harm-producing act." *Schovanec*, 188 P.3d at 168.

Furthermore, Plaintiff alleged that prior to 2023, BOP had notice of the risks posed by surveillance-camera blind spots in women's prisons, of just the sort Officer Banks exploited when he assaulted and battered Plaintiff. Compl. ¶ 21. A DOJ working group's November 2022 report "noted the problems created by blind spots in many women's prisons and suggested that the 'BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'" *Id.* (quoting and citing report). These allegations, together, are sufficient at this stage to state a claim of negligent hiring, supervision, or retention.

## IV. CONCLUSION

For the forgoing reasons, Defendant's motion to dismiss should be denied. If the Court grants the motion, Plaintiff respectfully requests leave to amend.

Respectfully submitted,

DATED: August 26, 2026

*/s/ Emma Stodder*

Emma Stodder
WIED Bar No. 362691
Kara J. Janssen
WIED Bar No. 274762
Luma Khabbaz
WIED Bar No. 351492
Attorneys for Plaintiff
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
estodder@rbgg.com
kjanssen@rbgg.com
lkhabbaz@rbgg.com

Hanna R. Kolberg
WI State Bar ID No. 1067382
Christopher E. Avallone
WI State Bar ID No. 1095465
Attorneys for Plaintiff
VON BRIESEN & ROPER, S.C.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, Wisconsin 53202
Telephone: (414) 276-1122
hanna.kolberg@vonbriesen.com
christopher.avallone@vonbriesen.com